57 P.3d 447

**In the Interest of Jane DOE, Born on December 15, 1982; John Doe, Born on August 24, 1984.**

**In the Interest of John DOE, Born on October 20, 1991; John Doe, Born on November 24, 1992.**

**Nos. 23663, 23664.**

Supreme Court of Hawaiʻi.

Nov. 8, 2002.

Lloyd Van de Car, on the briefs, for mother-appellant.

Brian J. De Lima and David H. Lawton (Crudele, De Lima & Shiroma), on the briefs, Hilo, for father-appellant.

Marlene Q.F. Young, Mary Anne Magnier and Jay K. Goss, Deputy Attorneys General, on the briefs, for Department of Human Services-Appellee.

MOON, C.J., LEVINSON, NAKAYAMA, RAMIL, and ACOBA, JJ.

Opinion of the Court by ACOBA, J.

We hold that parents who are in need of an interpreter because of their inability to understand English are entitled to the assistance of one at any family court hearing in which their parental rights are substantially affected. However, under the circumstances of this case, Appellant–Mother [1] (Mother) has failed to demonstrate her "need of an interpreter" and the manner, if any, whereby she was substantially prejudiced by the absence of an interpreter at certain proceedings. Moreover, Appellee–Department of Human Services (DHS) established by a preponderance of the evidence that Mother's children were harmed by her or that she presented a threat of harm to them. As to Father, despite his contention that the Family Court of the Third Circuit [2] (the court) inappropriately considered his behavior outside of Hawai'i, the court's findings that he harmed his children and posed a threat to them can be sustained on the basis of Father's actions in Hawai'i. Therefore, we hold that the court properly exercised jurisdiction in the instant case. We affirm the court's May 22, 2000 decision and order which granted foster custody of Jane Doe (born 12/15/82), John Doe 1 (born 8/24/84), John Doe 2 (born 10/20/91), and John Doe 3 (born 11/24/92) (collectively,

1. For purposes of preserving confidentiality, the subject children are referred to as Jane Doe and John Does 1 through 3, Appellant–Father is referred to as "Father," and Appellant–Mother is referred to as "Mother."

2. The Honorable Ben Gaddis presided over this case.

3. HRS § 587–11 states:

**Jurisdiction.** Pursuant to [section] 571–11(9), the court shall have exclusive original jurisdiction in a child protective proceeding concerning <u>any child who was or is found within the State at the time the facts and</u>

Children) to DHS and the July 31, 2000 order denying parents' motion for reconsideration.

I.

■ All four children, who are the subject of the proceedings, are the natural children of Father. Mother is the natural mother of only John Doe 2 and John Doe 3. Jane Doe and John Doe 1 are now eighteen years old. Family court jurisdiction over them has expired because they are not less than eighteen years of age. *See* Hawai'i Revised Statutes (HRS) §§ 587–2 (1993) and –11 (1993).[3] Therefore, all appeals regarding Jane Doe's and John Doe 1's foster custody status are now moot.

DHS received a referral on August 6, 1999, alleging that Father had sexually abused Jane Doe and had physically abused the Children. On August 19, 1999, a detective and DHS social worker interviewed Mother and Father. John Doe 2 and John Doe 3 were taken into protective custody after the interview, but John Doe 1 remained in the family home. On August 23, 1999, DHS filed a Petition for Temporary Foster Custody. The first hearing for this case was held on August 25, 1999, at which time the court awarded temporary foster custody to DHS and set the case for a return date of September 2, 1999.

Mother is a native of the Marshall Islands, and her primary language is Marshallese. At the return date hearing on September 2, 1999, the first hearing at which he appeared, Mother's attorney asked for an interpreter "because [he didn't] feel confident that [Mother could] fully understand" the pro-

<u>circumstances occurred, are discovered, or are reported to the department,</u> which facts and circumstances constitute the basis for the finding that <u>the child is a child whose physical or psychological health or welfare is subject to imminent harm, has been harmed, or is subject to threatened harm</u> by the acts or omissions of the child's family.

(Boldfaced emphasis in original, underscored emphases added.)

"Child" is defined as "a person who is born alive and is less than eighteen years of age." HRS § 587–2 (1993).

ceedings. At a continued status conference held on October 13, 1999, Mother's attorney again explained that "it's becoming increasingly obvious that she really needs an interpreter." On November 1, 1999, the first day of the combined adjudicatory/disposition hearing,[4] an interpreter was present during Mother's testimony. The court related that an interpreter would assist Mother

> not because she cannot communicate about everyday matters but because the particular nature of these proceedings involves the use of unusual language, legal concepts that are difficult to sometimes understand and rather specialized English that the Court feels [Mother] probably does not understand.

The court made its decision after questioning Mother on the record without an interpreter. That afternoon, the court chose to handle "housekeeping" matters rather than take further testimony from Mother because of the interpreter's absence. At the close of the hearing, the court told Mother's attorney, "I should leave you in charge. You certainly did better than everybody else [at obtaining an interpreter]," but then asked the bailiff to obtain an interpreter for the next hearing.

At the continuation of the disposition hearing on November 2, 1999, an interpreter was not present. Mother's attorney again requested an interpreter. After a recess, however, he informed the court that Mother was willing to proceed without an interpreter for

that day on the condition she not testify.[5] The court did not question Mother regarding this procedure, but rather recounted its efforts to secure a Marshallese interpreter, explaining that, "[b]ased on the Court's observation of [M]other during her testimony, *I don't think that it will be prejudicial for her to continue the trial with other witnesses. I think she comprehends the English language marginally and can understand the proceeding.*" (Emphasis added.) The November 2, 1999 hearing continued with the testimony of Jane Doe's foster parent, the foster parent of John Doe 2 and John Doe 3, and the DHS social worker assigned to the case. Jane Doe's foster mother testified about several conversations she had with Mother,[6] each of which took place in English. Jane Doe's foster mother, who does not speak Marshallese, explained, "[Mother] can speak English.... I can understand her and we have conversations for hours. She can speak. She may have a heavy accent, but that's not a problem." At the close of the hearing, the court conducted the following colloquy with Mother's attorney:

> THE COURT: ... We have yet to secure a Court[-] certified interpreter. We have a call in to one on Oahu.
>
> [Mother's attorney], what I want to do is tender the question to you, will it be satisfactory to have the interpreter only for your client's testimony or do you wish to

---

4. At an adjudication hearing, the court considers and determines whether "the child is a child whose physical or psychological health or welfare has been harmed or is subject to threatened harm" and in that event whether to sustain the custody petition. HRS § 587–63 (1993). A disposition hearing is usually only held when a petition survives the adjudication hearing. At a disposition hearing, the court assesses "initially whether the child's family home is a safe family home." HRS § 587–71(a) (Supp.2000). "If the court determines that the child's family home is not a safe family home, even with the assistance of the service plan" (a plan that outlines steps to create a safe family home, *see* HRS 587–26 (1993)), the court may set a show cause hearing where the child's family has the burden of establishing "why the case should not be set for a permanent plan hearing." HRS § 587–71(d) & (e) (Supp.2000). In cases where the child has been living outside of the home for twelve consecutive months, a show cause hearing must be held. *See* HRS § 587–71(e).

At a permanent plan hearing, the court "shall consider fully all relevant *prior* and current *information* pertaining to the safe family home guidelines[.]" HRS § 587–73(a) (Supp.2000) (emphases added).

5. Mother's counsel indicated as follows:

> Judge, my client, [Mother], indicated to me during the break that *she wishes to proceed today without an interpreter.* However, she would not want to testify today but just be present at the proceedings.
>
> I talked it over with [the deputy attorney general] and [Father's attorney] and they're agreeable to proceeding with other witnesses and we can recall [Mother] at a later date. (Emphasis added.)

6. For example, in one instance, Mother arrived at the witness's door crying and reported to her that Father had sliced her leg with a knife.

have the interpreter for the remainder of the trial?

Or put it another way, how have you managed to get along using the process that we used today?

[MOTHER'S ATTORNEY]: Your Honor, may I just confer with [Mother]?

THE COURT: Yes. Sure.

(Off-the-record discussion.)

[MOTHER'S ATTORNEY]: Your Honor, my client indicated that her preference is to have an interpreter here all the time, if that can be managed. That's her first choice, Your Honor.

THE COURT: Uh-huh. Well, I can attempt to arrange that, but I cannot guarantee that.

I can certainly—it's pretty obvious to me that she needs an interpreter for her testimony. And I can certainly—we can arrange a schedule to accommodate that...

*If we cannot secure an interpreter, [Mother's attorney], does your client wish to go ahead and proceed with other witnesses or does she want to postpone the date and have us wait until we can find one?*

(Off-the-record discussion.)

[MOTHER'S ATTORNEY]: *We can proceed, Your Honor.*

THE COURT: Okay.... I want the record to be clear. We have a central master list of court interpreters state wide. And we're calling all the interpreters we can find that speak Marshallese.

[MOTHER'S ATTORNEY]: Okay. Your Honor, at what point in time—should I make my own efforts or am I—

THE COURT: Well, given the way your efforts have worked out, I'm a little leery...

[MOTHER'S ATTORNEY]: I would prefer the Court get its own interpreter.

THE COURT: I think that might be better.

(Emphases added.)

On December 17, 1999, Father called Mother to the stand without an interpreter present. Before her testimony, however, the deputy attorney general representing DHS inquired of the court as to whether the court was "going to have problems with an interpreter." A recess was taken and, upon resuming the hearing, the court stated, "We're going to call [Mother]," to which Mother's attorney responded, "Yes, Your Honor." The direct examination proceeded with difficulty initially:

[FATHER'S ATTORNEY]: [Mother], since the children were removed from your home the second time, how many visits have you had with the children?

A: *I don't understand. I don't understand.*

[DEPUTY ATTORNEY GENERAL]: Judge, that's my problem. I mentioned to counsel off the record that we might have some problems with interpretation—I'm sorry—not having an interpreter here. And *he assured me they were simple questions, but even with simple questions, we have some difficulty.*

[THE COURT]: [Father's attorney]?

[FATHER'S ATTORNEY]: If I can try with a few questions.

[THE COURT]: We'll try.

[FATHER'S ATTORNEY]: If we can't we can't.

[THE COURT]: If you do not understand, that's okay.

[MOTHER]: Okay.

[THE COURT]: Okay? Let us know. We will try to ask again, okay?

[MOTHER]: Okay.

[THE COURT]: Okay.

(Emphases added.) The remainder of the hearing on December 17 was completed without the aid of an interpreter. The resulting examination proceeded smoothly. For example, Mother testified as follows:

Q [FATHER'S ATTORNEY]. Did you have a visit with [John Doe 3] and [John Doe 2] yesterday?

A. [MOTHER] Yes.

Q. Was it a good visit?

A. It's good.

Q. Did the children ask about [Father]?

A. Yes.

Q. *What did they ask?*

A. *They said to me, where is [Father], mommy? And I said, you know, [Father], he work, office, working. That's all they said to me yesterday.*

Q. Could you tell if they were happy or sad that [Father] wasn't there?

[DEPUTY ATTORNEY GENERAL]: Your Honor, I know—objection, first of all. I know we're kind of taking some liberties here but, you know, that's a very leading question, and I object to the leading.

THE COURT: Overruled. Ask it again.

[FATHER'S ATTORNEY]: Okay.

. . . .

Q. Did you understand the question, could you tell if the children were happy or sad that [Father] wasn't there?

A. They happy.

Q. Okay. Can you tell what were they happy about.

A. They just happy with the father, [John Doe 1] and—

Q. Okay. So they were happy to have the visit with [John Doe 1]?

A. Yeah.

. . . .

Q. In the visit before yesterday—you remember having a visit before yesterday with the children. Did the children ask about [Father] at that other visit?

A. Yes.

Q. And at yesterday's visit, was there somebody from CPS watching?

A. No.

Q. Was someone named Malana (phonetic) at yesterday's visit?

A. Yes.

. . .

Q. And was she there when the children asked about [Father]?

A. No. She was in the bathroom with my oldest one, [John Doe 2].

Q. Okay. Now, yesterday's visit, [John Doe 1] was there.

A. Yes.

Q. Was Phillip [ (John Doe 1's adult brother) ] there?

A. Yesterday?

Q. Yesterday.

A. No.

Q. Was Phillip at the visit before?

A. Yes.

Q. Have the children ever told you that they're afraid of [Father]?

A. No.

. . . .

Q [ MOTHER'S ATTORNEY]. [Mother], in your opinion do the children, [John Doe 2] and [John Doe 3], do they miss [Father]?

A. Yes.

Q. Nothing further, Your Honor.

In the course of Mother's testimony, the court inquired as to whether or not she spoke English or Marshallese with the Children. Mother explained that she spoke only English with the Children:

THE COURT: When you talk to the kids, what language do you use when you talk to the kids?

THE WITNESS: Just little English.

THE COURT: *What language do the children speak? Do they speak Marshallese?*

THE WITNESS: *No.*

THE COURT: Oh. *So you speak to them in English.*

THE WITNESS: *Yes.*

THE COURT: *And they speak to you in English.*

THE WITNESS: *English, yes, Your Honor.*

THE COURT: *They don't understand Marshallese at all.*

THE WITNESS: *No.*

Phillip also testified at the December 17 hearing. He reported that, at home Mother speaks English:

THE COURT: How do you communicate with [Mother], in other words, right, that's here, she speaks Marshallese most, is that her native language?

[PHILLIP]: Yes.

THE COURT: Do you speak Marshallese?

[PHILLIP]: No, I don't.

THE COURT: No. *So at home, how do you communicate?*

[PHILLIP]: *In English.*

THE COURT: In English?

[PHILLIP]: Yeah. Small language, yeah.

THE COURT: But she doesn't speak English very well.

[PHILLIP]: No, not very well.

THE COURT: *But it works okay.*

[PHILLIP]: *Yes.*

(Emphases added.) As indicated, Father's attorney and Mother's attorney were able to conduct direct examination and the deputy attorney general conducted cross-examination.

On December 27, 1999, at the continued hearing, an interpreter was present. At the outset of the hearing, the court informed Mother's attorney that it wanted to "finish with [Mother's testimony] ... while we have an interpreter." On December 27, 1999, an acquaintance of the parents testified, as did the foster mother of one of John Doe 1's friends. Mother testified with the aid of an interpreter.

The case continued on February 1, March 14, March 21, March 28, and April 10, 2000. There was no interpreter at any of these hearings. Several witnesses testified, including the DHS social worker, Father, Father's acquaintance, John Doe 1, Father's adult son, and the guardian ad litem.

At the February hearing, the DHS social worker asserted that Mother had a competent command of the English language, and that she was surprised by Mother's lack of English skills when she testified:

[MOTHER'S ATTORNEY]: What if anything did you do to prepare yourself to speak with [Mother] once you found out she was from Marshall Islands?

[DHS SOCIAL WORKER]: When I did meet them, *[Father] had already told me that [Mother] does understand English.* And when I talked to her, it seemed ade-

quate that we could communicate, that I didn't need an interpreter at that time.

Q. Did you offer an interpreter at that time?

A. No, I did not.

Q. Earlier in your testimony *you stated that she can express herself very well in English.* But at the time of the interview you felt otherwise? Your first interview I'm talking about.

A. *I felt we could communicate in English.* I thought it was adequate.

Q. After hearing her testimony during this case, is your opinion still the same?

A. *All I know is she spoke English with me very well. And I was a little surprised when I saw her—I heard her on the stand.*

(Emphases added.)

At the March 28 hearing, John Doe 1 similarly testified that Mother comprehends and speaks English:

Q [FATHER'S ATTORNEY]. How do you get along with [Mother]?

A. [JOHN DOE I]. Good.

Q. Do you talk to her quite a bit?

A. Yes.

Q. Does she seem to you like she understands English pretty well?

A. Yes.

Q. *Does she have any problems understanding what you want to talk to her about?*

A. *Sometimes.*

Q. When you ask her questions, does she understand what you're—does she generally understand what it is you're asking her?

A. *Most of the time.*

Q. Do you speak Marshallese?

A. No.

(Emphases added.)

In its May 22, 2000 "Decision and Order," [7] the court awarded foster custody of the children to DHS, finding that the children "are subject to a reasonable foreseeable substan-

---

7. · The court's Decision and Order did not contain a section entitled "Findings" nor a section entitled "Conclusions of Law." Its provisions, how- ever, amounted to findings of fact and conclusions of law and we treat them as such.

tial risk of harm ... due to Father's violent conduct," that Mother "has perpetrated harm upon the children by omission," that "[i]t is not reasonably foreseeable that [Mother] will be able to protect the children from threatened harm by Father in the near future," and that "the family home is not safe for any of the minor children even with the assistance of a service plan."[8] The court also found that Mother's English was sufficient for the purposes of the hearings:

> 7. While [Mother] is a native of the Marshall Islands and does not speak English fluently, she is able to comprehend basic questions posed in English about everyday life. [Mother] was able to communicate effectively with the social workers who interviewed her. She understand [sic] and responded in an intelligible manner to questions posed.

The Decision and Order did not specify whether the foster custody was "permanent" or "temporary"; however, the award of foster custody is not subject to any time limit. Mother moved for reconsideration on June 9, 2000, and Father similarly moved on June 13, 2000. On July 31, 2000, the court denied the motions for reconsideration. Mother and Father filed a joint notice of appeal on August 10, 2000.

On June 19, 2000, June 30, 2000, July 14, 2000, and September 16, 2000, the court entered orders stating that "[e]ach party understands that unless the family is willing and able to provide the children with a safe family home within a reasonable period of time, their respective parental and custodial duties and rights shall be subject to termination[.]"

DHS subsequently filed permanent plans[9] for the Children which proposed goals of permanent custody jurisdiction to DHS by November 2000 for John Doe 1 and guardianship to the current caretakers or other family members of John Does 2 and 3 by February 2001. On August 11, 2000, an order to show cause hearing was held and the "parties stipulated that it [was] not in the best interest of the children to proceed to a permanent plan hearing at [that] time." At the show cause hearing, a review date of December 14, 2000 was set. On November 17, 2000, DHS filed a Safe Family Home Report that recommended DHS's foster custody of the children be continued "until permanency can be addressed" and advised that Mother and Father were unlikely to resolve safety issues "within a reasonable time frame." The record on appeal does not reflect what, if anything, took place at the December 14, 2000 review hearing.

## II.

Mother raises the following points on appeal: (1) the court failed to provide Mother

---

8. HRS §§ 587–25 (1993), –71, and –2 are relevant to the court's findings.

HRS § 587–25 mandates:
(a) The following guidelines shall be fully considered when determining whether the child's family is willing and able to provide the child with a safe family home:

. . .

(2) The initial and any subsequent *reports of harm and/or threatened harm* suffered by the child;

. . . .

(b) The court shall consider the likelihood that the current situation presented by the guidelines set forth in subsection (a) *will continue in the reasonably foreseeable future* and the likelihood that the court will receive timely notice of any change or changes in the family's willingness and ability to provide the child with a safe family home.
(Emphases added.)
HRS § 587–71(d) states:
If the court determines that the child's family home is not a safe family home, even with the assistance of a service plan, the court shall vest foster custody of the child in an authorized agency and enter such further orders as the court deems to be in the best interests of the child.

HRS § 587–2 defines "harm" in relevant part as

a case where there exists evidence of injury, including but not limited to:
(1) Any case where the child exhibits evidence of:

. . . .

(J) Extreme pain,
(K) Extreme mental distress[.]

. . . .

(3) Any case where there exists injury to the psychological capacity of a child as is evidenced by a substantial impairment in a child's ability to function[.]

9. "[A] [p]ermanent plan is a specific written plan, ... which should set forth: ... [a] position as to whether the court should order an adoption, guardianship, or permanent custody of the child[.]" HRS § 587–27 (1993).

with an interpreter for all proceedings; and (2) DHS did not establish that John Doe 2 and John Doe 3 were harmed by Mother or that Mother presented a harm to them. Father raises the following points on appeal: (1) the court failed to exclude statements Mother made to a social worker without the assistance of an interpreter; (2) the court made unsupported findings regarding Father's consumption of alcohol; (3) the court made numerous factually incorrect findings; (4) the court accepted testimony of Jane Doe's foster mother without making findings as to her challenged credibility; (5) the court gave weight to testimony regarding purported acts of harm which occurred outside of Hawai'i and the United States; (6) HRS § 587–11 violates due process because it is overbroad; (7) the court's delay in concluding the adjudication hearings resulted in a violation of Father's due process rights; and (8) the court erred in finding that Father subjected the children to harm. We initially address Mother's first contention and will resolve her second point while discussing Father's arguments.

### III.

As mentioned, we believe that parents who need an interpreter because of their inability to understand English are entitled to the assistance of one at any family court hearing in which their parental rights are substantially affected. However, because Mother has not shown that the court erred in finding that she could comprehend and speak English, it cannot be said that Mother was substantially prejudiced by the absence of an interpreter.

▮ It is well-established that parental rights are of constitutional dimension. In *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct.

1208, 31 L.Ed.2d 551 (1972), the United States Supreme Court stated:

> The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment,[10] *Meyer v. Nebraska*, [ ] 262 U.S. [390,] 399, 43 S.Ct. [625,] 626 [67 L.Ed. 1042] [(1923)], the Equal Protection Clause of the Fourteenth Amendment,[11] *Skinner v. Oklahoma*, [ ] 316 U.S. [535,] 541, 62 S.Ct. [1110,] 1113 [86 L.Ed. 1655] [(1942)], and the Ninth Amendment,[12] *Griswold v. Connecticut*, 381 U.S. 479, 496, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (Goldberg, J., concurring).

*Id.* at 651, 92 S.Ct. 1208. Accordingly, the "rights to conceive and to raise one's children" are "essential, . . . basic civil rights of man" protected by the United States Constitution. *Id.* The Court has affirmed that a parent's desire for "the . . . *custody* of his or her children . . . undeniably warrants deference, and absent a powerful countervailing interest, protection." *Lassiter v. Department of Social Servs. of Durham County, N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (citation and internal quotation marks omitted). (Emphasis added.) Indeed, "the interest of parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests recognized by [the United States Supreme Court]." *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (plurality opinion).[13] Similarly, the appellate courts of this state, referring to the federal constitution, have affirmed that, " '[a]lthough the interests of the child are of paramount concern, the parents have a *cognizable and substantial interest in the child which is constitutionally protected* . . . .' " *In re Doe Children*, 85 Hawai'i 119, 123, 938 P.2d 178, 182 (App.1997) (quoting *In re Wel-*

10. The fourteenth amendment's due process clause states that no state shall "deprive any person of life, liberty, or property, without due process of law[.]" U.S. CONST. amend. XIV, § 1.

11. The fourteenth amendment's equal protection clause states that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1.

12. The ninth amendment states, "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." U.S. CONST. amend. IX.

13. There was no majority opinion in *Troxel*. However, in spite of several concurring and dissenting opinions, a majority of the justices agreed that parental rights are constitutionally significant.

*fare of McGee*, 36 Wash.App. 660, 663, 679 P.2d 933, 935 (Wash.Ct.App.1984) (internal citations omitted) (emphasis added)). "The 'manifest importance of the right of a parent to raise his or her child"' has been "analogized to a 'fundamental liberty interest[.]"' *In re Doe*, 96 Hawai'i 272, 283–84, 30 P.3d 878, 889–90 (2001) (quoting *In re Doe*, 77 Hawai'i 109, 114–15, 883 P.2d 30, 35–36 (1994)).

While Hawai'i's appellate courts have not *expressly* held that individuals' parental rights are protected under the Hawai'i constitution, the courts have addressed whether such rights are protected under the due process clause of the Hawai'i Constitution, article I, section 5. *See In re Doe*, 95 Hawai'i 183, 185, 191–92, 20 P.3d 616, 618, 624–25 (2001) (discussing contention that Child Protection Act deprives parents of due process under both federal and Hawai'i constitutions); *In re Doe Children*, 85 Hawai'i at 123, 126, 938 P.2d at 182, 185 (holding that mother, in a Child Protective Act case, had procedural due process right under both state and federal constitutions to submit questions to be asked of minors in chambers); *In re Male Child, Born May 27, 1983*, 8 Haw.App. 66, 75, 793 P.2d 669, *cert. denied*, 71 Haw. 668, 833 P.2d 900 (1990) (addressing claim that family court violated parents' due process rights under both federal and Hawai'i constitutions for alleged failure to timely notify parents of basis for petition for termination).

■ We affirm, independent of the federal constitution, that parents have a substantive liberty interest in the care, custody, and control of their children protected by the due process clause of article 1, section 5 of the Hawai'i Constitution.[14] Parental rights guaranteed under the Hawai'i Constitution would mean little if parents were deprived of the custody of their children without a fair hear-

ing. Indeed, "[p]arents have a fundamental liberty interest in the care, custody, and management of their children [and][t]he state may not deprive a person of [his or] her liberty interest without providing a fair procedure for the deprivation." *Hollingsworth v. Hill*, 110 F.3d 733, 738–39 (10th Cir.1997) (citations and internal quotation marks omitted). ·Furthermore, "[t]he Supreme Court has said that parental rights cannot be denied without an opportunity for them to be heard at a *meaningful time and in a meaningful manner.*" *Brokaw v. Mercer County*, 235 F.3d 1000, 1020 (7th Cir.2000) (citing *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)) (internal quotation marks omitted); *see also Morrell v. Mock*, 270 F.3d 1090, 1095 (7th Cir.2001) (explaining that a "claim ... based on a [parent's] liberty interest [is] protected by the due process clause of the Fourteenth Amendment [and t]o meet the requirements of due process, the state must afford notice and an opportunity to be heard at a meaningful time and in a meaningful manner") (citations and internal quotation marks omitted).

■ Procedural due process requires that an individual whose rights are at stake understand the nature of the proceedings he or she faces.[15] *See State v. Casipe*, 5 Haw.App. 210, 214, 686 P.2d 28, 32, *cert. denied*, 67 Haw. 686, 744 P.2d 781 (1984) ("Where incompetence of the interpreter is claimed by a defendant to have deprived him [or her] of a fair trial, the crucial question is: Was the testimony as presented through the interpreter understandable, comprehensible[,] and intelligible, and if not, whether such deficiency resulted in the denial of defendant's *constitutional rights?* " (Emphasis added.)). "Fundamental due process rights may require ... an interpreter to translate courtroom proceedings. This is so because *inher-*

---

**14.** The due process clause of article 1, section 5 of the Hawai'i Constitution states, "No person shall be deprived of life, liberty, or property without due process of law[.]" Substantive due process "protects those fundamental rights and liberties which are ... " 'implicit in the concept of ordered liberty[.]"' *Washington v. Glucksberg*, 521 U.S. 702, 720–21, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997). Procedural due process guarantees a meaningful opportunity to be heard. *See In re Genesys Data Technologies, Inc.*,

95 Hawai'i 33, 40, 18 P.3d 895, 902 (2001); *Turner v. Hawai'i Paroling Auth.*, 93 Hawai'i 298, 310, 1 P.3d 768, 780 (2000) (explaining that the procedural due process right is a "right not to be deprived of a liberty interest without reasonable notice and a meaningful opportunity to be heard." (Citation and internal quotation marks omitted.)).

**15.** *See supra* note 14.

ent in [the] nature of justice is the notion that those involved in litigation should understand and be understood." ' *Figueroa v. Doherty,* 303 Ill.App.3d 46, 236 Ill.Dec. 527, 707 N.E.2d 654, 658 (1999) (quoting 25 Am. Jur.2d *Trial* § 230 (1991)) (emphasis added).

In that regard, two jurisdictions have considered whether interpreters should be provided at proceedings in which parental rights were affected. In *In re Valle,* 31 S.W.3d 566 (Tenn.Ct.App.2000), the Tennessee Court of Appeals referred to several sources in determining that parents are entitled to an interpreter in the course of a parental termination proceeding. Noting (1) that in criminal cases " 'it is the duty of the court to provide the necessary means for the defendant to understand the nature of the charges against him [or her], the testimony of the witnesses, and to communicate to the court,' " *id.* at 573 (quoting *State v. Thien Duc Le,* 743 S.W.2d 199 (Tenn.Crim.App.1987)), (2) that, generally, "the party litigant is entitled to be present in all stages of the actual trial of the case," *id.* (citing *Warren v. Warren,* 731 S.W.2d 908, 909 (Tenn.Ct.App.1985)), and (3) that the Tennessee Rules of Civil Procedure provide for appointment of an interpreter, *see id.* at 572,[16] the appellate court concluded that, "[c]onsidering the drastic nature of a termination of parental rights case, it is particularly incumbent on the trial court to be careful in exercising discretion for the appointment of an interpreter," *id.* at 573. Ruling that the trial court did not sufficiently inquire into the parents' need for an interpreter, it or-

dered the trial court on remand to address such a need.[17] *See id.*

In *In re Kafia M.,* 742 A.2d 919 (Me.1999), mother claimed that the absence of an interpreter at the early stages of a child protection proceeding violated her due process rights. A Somali speaker, mother was not provided an interpreter during earlier, related contacts with social worker personnel but was provided an interpreter throughout the termination proceedings. The Supreme Judicial Court of Maine determined there was no due process violation because the father interpreted their communications with mother. *See id.* at 927.

## IV.

 In light of the constitutional protection afforded parental rights, we hold that, as an aspect of procedural due process, individuals must, as needed, be provided an interpreter at family court proceedings where their parental rights are substantially affected.[18] Whether or not a person's parental rights are so affected is a question that must be resolved on a case-by-case basis and cannot be determined by a bright-line test. *Cf. Lassiter,* 452 U.S. at 32, 101 S.Ct. 2153 (when discussing whether a parent has a right to an attorney in parental termination cases, explaining that "it is neither possible nor prudent to attempt to formulate a precise and detailed set of guidelines to be followed in determining when the providing of counsel is

16. Tennessee Rule of Civil Procedure 54.04(3) states that

> [t]he court may appoint an interpreter of its own selection and may fix reasonable compensation. The compensation shall be paid out of funds provided by law or by one or more of the parties as the court may direct, and may be taxed ultimately as costs in the discretion of the court.

Hawai'i Family Court Rule 43(f) is identically worded, but was not in effect at the time this case commenced.

17. The court "reversed" the trial court and remanded the case because the parents were not provided an attorney for the proceedings. *See In re Valle,* 31 S.W.3d at 572 & 573.

18. The appellate courts of this jurisdiction have, in other settings, applied procedural due process

protection only where an individual's rights are *substantially* affected. *See In re Doe,* 91 Hawai'i 147, 150, 981 P.2d 704, 707 (App.1998), *rev'd on other grounds,* 90 Hawai'i 246, 978 P.2d 684 (1999) ("To require dismissal of a charge [on speedy trial grounds], it is necessary that[, *inter alia,*] the delay cause substantial prejudice to the accused's rights to a fair hearing[ ]" (Internal quotation marks, brackets, and citations omitted.)); *In re Doe,* 62 Haw. 70, 74, 610 P.2d 509, 512 (1980) ("Due process requires that a youthful offender whose substantial rights would be affected by a family court order revoking probation and terminating the stay of a mittimus be furnished with due notice of the contemplated action, as well as a hearing." (Citations omitted.)); *Stafford v. Dickison,* 46 Haw. 52, 64, 374 P.2d 665, 672 (1962) ("The right of a citizen to due process of law must rest upon a basis more substantial than favor or discretion." (Internal quotation marks and citation omitted.)).

necessary to meet the applicable due process requirements, since here, ... the facts and circumstances are susceptible of almost infinite variation" (internal quotation marks, brackets, ellipsis points, and citation omitted)). An example of a family court proceedings where a person's parental rights are substantially affected would be the combined adjudication/disposition hearings in this case, where one purpose of the hearings was to determine whether or not parental rights should eventually be terminated.

■ To assess whether an interpreter is necessary, trial courts should consider the guidelines adopted by the Chief Justice on June 22, 1995. Those guidelines, proposed by the Joint Judiciary–Bar Task Force on Certification of Court Reporters, indicate that

[a]n interpreter is needed if, *upon examination by the court*, (1) a party or witness is unable to speak English so as to be understood directly by counsel, court, and jury, or (2) if a party is *unable to* hear, *understand, speak and/or use English sufficiently to comprehend the proceedings* and to assist counsel in the conduct of the case.[19]

Supreme Court of Hawai'i, *Policies for Interpreted Proceedings in the Courts of the State of Hawai'i* Rule 1(A) (adopted June 22, 1995) (emphases added.)

■ With these guidelines in mind, it cannot be said that Mother has demonstrated she was substantially prejudiced by the absence of an interpreter at some of the hearings. Several witnesses testified that Mother comprehends and speaks English in daily conversation, and specifically at home. The court also found that Mother "underst[ood] and responded in an intelligible manner to the questions posed." Under the facts, this finding was not clearly erroneous. Mother was able to answer most questions without the aid of an interpreter, evidencing under the circumstances of this case that, although an interpreter at all stages would have been preferable, the absence of one did not substantially prejudice her.

■ Also, we concur with DHS's argument that Mother's agreement to proceed without an interpreter in some instances and her failure to request postponement of proceedings in the interpreter's absence, when explicitly given that opportunity, reflects upon her acquiescence to the procedures followed.

### · V.

As will be discussed *infra*, resolution of Mother's remaining contention is somewhat dependent upon the outcome of Father's substantive arguments on appeal. Thus, it is helpful to consider several of Father's substantive claims next.

We consider, first, Father's challenges to several findings of fact. As set forth *infra*, we discern no error in the court's findings that require reversal. A finding of fact is clearly erroneous when "(1) the record lacks substantial evidence to support the finding,

19. We note that the federal government requires the appointment of an interpreter in proceedings instituted by the United States where a party "speaks only or primarily a language other than the English language ... so as to inhibit such party's comprehension of the proceedings or communication with counsel or the presiding judicial officer[.]" 28 U.S.C. § 1827(d)(1) (2000).

Some states compel the attendance of an interpreter in civil cases by statute. *See, e.g.*, N.J.Rev. Stat. § 2B:8–1 (2000) ("Each county shall provide interpreting services necessary for cases from that county in the Law Division and the Family Part of the Chancery Division."); Kan. Stat. Ann. § 75–4351 (2000) ("A qualified interpreter shall be appointed ... for persons whose primary language is one other than English ... in any civil proceeding, whether such person is the plaintiff, defendant[,] or witness in such action[.]"). Other states require the appointment of an interpreter in general legal matters. *See* Wash. Rev.Code § 2.43.010 (2000) (providing for interpreters "to secure the rights, constitutional or otherwise, of persons who, because of a non-English-speaking cultural background, are unable to readily understand or communicate in the English language, and who consequently cannot be fully protected in legal proceedings unless qualified interpreters are available to assist them"). Finally, at least one state secures a criminal defendant's right to an interpreter through its constitution. *See* Cal. Const. art. 1, § 14 ("A person unable to understand English who is charged with a crime has a right to an interpreter throughout the proceedings.")

Hawai'i lacks any comparable constitutional or statutory provision.

or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made." *State v. Okumura*, 78 Hawai'i 383, 392, 894 P.2d 80, 89 (1995) (citation omitted). The record in the instant case contains substantial evidence, that is, "credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion" consistent with the court's findings. *In re Doe*, 84 Hawai'i 41, 46, 928 P.2d 883, 888 (1996). Thus, the challenged findings of fact were not clearly erroneous.

▆▆▆ Each of the contested findings regarding Father's alcohol use is supported by substantial evidence.[20] Similarly, the record established that the contested paragraphs in the decision and order regarding Father's physical abuse of the boys and Mother were not clearly erroneous.[21] Paragraphs 31, 32, 33, and 38 pertain exclusively to Father's treatment of Jane Doe. As stated *supra*, the appeal as it regards her status is moot. Similarly, Finding 58(C) relates sin-

gularly to John Doe 1 and thus we need not address that finding because the question of its validity is moot.

We examine paragraphs 58 and 59 in more detail.[22] Paragraph 58 states:

58. Father has subjected the children to harm as that term is defined by Chapter 587 H.R.S. in the following ways: [23]

. . . .

D. He has struck one of the two younger sons in the head with a stick.

E. His abuse of alcohol and violent conduct in the home has created an atmosphere of fear and anxiety which has caused injury to the psychological capacity of [John Doe 2] and [John Doe 3]. These children have experienced substantial impairment in their ability to function as evidenced by more frequent bed wetting, loss of appetite, and reluctance to have any contact with Father.

▆▆ As to paragraph 58(D), Father urges that he struck John Doe 2 with a stick to discipline him for lying.[24] However, at trial,

---

20. Jane Doe's foster mother stated that Father drank "every day," that she saw Father intoxicated "[f]our or five times a week," and that once, Father "could barely stand" due to his intoxication. She also told the court of an instance when Father "burnt [Jane Doe's boyfriend's] T-shirt" and that, that night, Father "just kind of waddled, he was really really drunk, majorly [sic] drunk. He couldn't even walk straight." John Doe 2 and John Doe 3's foster mother also related that John Doe 2 and John Doe 3 told her that their father drank "every day." John Doe 1 reported that, once, Father was drunk and "grabbed [him] and held [him] up against a wall," and on another occasion, Father "broke into [his] room" because "he was drunk." Father generally asserts that the court erred by "accepting the testimony of [Jane Doe's foster mother] without making findings as to her challenged credibility." It is evident from the findings that the court believed Jane Doe's foster mother and thus found her credible.

21. Although paragraph 16 states in part that "in California .. the police intervened with the family several times due to domestic disputes," the record reflects only one instance of police intervention. However, Mother testified that Father was arrested for hitting her and her testimony plainly supports the finding that the police intervened because of an incident of domestic violence. Furthermore, paragraph 26, reciting that Father hurt the younger boys by twisting their arms and that "[t]he boys have complained repeatedly to their siblings and other adults" about

this, was validated by the testimony of John Doe 2 and John Doe 3's foster mother. Similarly, paragraph 43, reciting that "Father pushed and slapped [Mother]" while they lived at the "Ainaloa complex," was established through Jane Doe's foster mother.

22. These paragraphs amount to conclusions of law and we regard them as such.

23. Paragraphs 58(A) and (B) involved Jane Doe only.

24. HRS § 703–309(1) (1993) states:

The use of force upon or toward the person of another is justifiable under the following circumstances:
(1) The actor is the parent or guardian or other person similarly responsible for the general care and supervision of a minor . . ., and:
 (a) The force is employed with due regard for the age and size of the minor and is reasonably related to the purpose of safeguarding or promoting the welfare of the minor, including the prevention or punishment of the minor's misconduct; and
 (b) The force used is not designed to cause or known to create a risk of causing substantial bodily injury, disfigurement, extreme pain or mental distress, or neurological damage.

Father adamantly denied using a stick or any other implement to discipline his children. In closing argument, however, his attorney maintained that, "even if it's true [that Father used a stick against his younger children], corporal punishment is permitted, and no statutory harm resulted." The court was free to completely disregard this argument in light of Father's testimony that he had not used a stick at all. Because the court was presented with the parental discipline claim and rejected it, we cannot conclude, under the circumstances, that the court's finding was clearly erroneous.

■ As to the court's conclusion of law set forth in paragraph 58(E), and contrary to Father's contention that the finding of psychological harm was unsupported, a psychologist who interviewed John Doe 2 and John Doe 3 on two occasions opined that it was "obvious" that John Doe 3 "was scared of his dad" and reported that he had "never seen any children [sic] this anxious, this fearful." [25] The psychologist surmised that the children's bed wetting "could be seen as a symptom of [their] anxiety" and that "these anxiety responses . . . are not normal, not natural, not healthy." This testimony was sufficient to support the court's finding of psychological harm.

■ Father argues that the conclusion contained in paragraph 59, to the effect that "[a]ll of the minor children in the family are subject to a reasonable foreseeable substantial risk of harm by domestic violence of inappropriate discipline due to Father's violent conduct," was error because "there is no evidence of domestic violence between Father and Mother in the State of Hawai'i." Plainly, by the reference to "inappropriate discipline," the court included Father's acts toward children as recounted, *supra*, that did occur in Hawai'i. There was also ample proof that Father committed "domestic violence" against Mother, as illustrated by the

testimony of a witness who reported a Hawai'i incident in which Mother appeared at her door bleeding and reported that Father had "sliced her leg with a knife."

## VI.

■ We conclude, further, that there is no reversible error as to Father's appeal in the court's refusal to exclude Mother's uninterpreted statements to the social worker. Although Mother's attorney moved to exclude the statements, Father's attorney did not join in that motion. Because he did not join in the motion, he cannot now raise the issue on appeal. *See State v. Staley*, 91 Hawai'i 275, 284 n. 7, 982 P.2d 904, 913 n. 7 (1999) (holding that failure to object amounts to a waiver of claim on appeal (citations omitted).). We therefore decline to address this issue.

## VII.

As mentioned, Mother's remaining point on appeal is that DHS failed to prove that she subjected John Doe 2 and John Doe 3 to harm, or that she presented them with a threat of harm by omission. Mother's contention appears to be two-fold: first, that there is no evidence that Father harmed the Children while Mother resided in the home; and second, that Mother never threatened harm to the children while in the home. Mother does not set out more than two findings to which she specifically attributes error. Those two findings are supported by the record.

### A.

■ She first declares that paragraph 26 of the Decision and Order was flawed because Father did not intend to hurt the children when he twisted their arms.[26] Assuming *arguendo* that "it was clear from that testimony that Father's aim was to teach

---

25. The psychologist has been in private practice in Hawai'i since 1974.

26. Paragraph 26 reads:
 26. Father is interested in martial arts and is heavily involved in Judo and Aikido. He encouraged all of his children to participate. Father has hurt the younger boys by using a

judo move in which he twists their arms until they cry. He used this move when he was drinking beer. The boys have complained repeatedly to their siblings and other adults about Father hurting them by twisting their arms.

skill, not to cause pain[,]" the fact is that the boys were injured by this maneuver, and that Father would not stop until they cried. Dr. Bratton testified that John Doe 3 informed him that he was "scared of his dad" because his father "twists [his] arm." Dr. Bratton asked John Doe 3 to demonstrate how Father did this, and John Doe 3 took Dr. Bratton's hand and "held his arm up over his head and then he did a complete 360–degree turn, which put a little bit of torque on [Dr. Bratton's] arm[.]" Undoubtedly, subjecting young children to such physical force caused the type of "extreme pain" envisioned in the definition of harm contained in HRS § 587–2(1)(J). Moreover, it plainly contributed to the anxiety the children felt. *See supra* section VII.

### B.

▆▆▆▆ Mother also attacks paragraph 44 of the Decision and Order, which recounts the trauma the Children suffered as witnesses to the domestic violence between their parents.[27] She does not contend that any of the factual references in that paragraph are incorrect, but rather that the court's finding that the boys "were particularly traumatized" by the violence was inaccurate, and that, in any event, such trauma "falls short" of the statutory definition of harm.

On the contrary, there was sufficient testimony adduced to establish that John Doe 2 and John Doe 3 were so traumatized. The safe family home report written by DHS discloses that Mother advised the DHS social worker that Father had physically abused her in the Children's presence. The social worker also testified that the Children's exposure to their father's abuse of Mother resulted in their feelings of helplessness and

that, as a result, "[t]hey've had to survive on their own pretty much or depend upon each other." The fact that the children felt helpless and dependant on one another evidences the "extreme mental distress" encompassed in the statutory definition of harm. *See* HRS § 587–2(1)(K).

▆▆▆▆ Mother contests the court's conclusion that she thus threatened harm to her children. That paragraph of the Decision and Order states:

> 60. [Mother] has perpetrated harm upon the children by omission. [Mother] is easily intimidated by Father. *She has failed to protect the children from the violent conduct of Father and has failed to report harm of the children to others. She has also failed to report Father's violations of prior domestic protective orders designed to protect the children from further harm.* It is not reasonably foreseeable that [Mother] will be able to protect the children from threatened harm by Father in the near future.

(Emphasis added.)

▆▆▆▆ Because Mother clearly contests only two of the findings, the remaining findings of the court are binding. *See Poe v. Hawaii Labor Relations Bd.,* 97 Hawai'i 528, 536, 40 P.3d 930, 938 (2002) ("Unchallenged findings are binding on appeal." (Citations omitted.)). Several such findings are pertinent to this conclusion.

In this regard, the court found that: (1) Mother chose to live with Father after the Children were removed from the home and placed in foster custody, even though she was provided the opportunity to remain with the Children at a domestic abuse shelter,[28] (2) Mother did nothing to prevent Father from

---

27. Paragraph 44 states:

> [John Doe 2] and [John Doe 3] were *particularly traumatized* by the violence that occurred between Father and their mother during the first half of 1999. James remembers seeing Father and his mother sitting on a mat drinking beer and arguing. The parents started hitting each other and spilled beer on themselves. [A neighbor] came and took the mother upstairs. [John Doe 2] also saw Father put a pillow over the face of [Mother] so that she could not breath [sic]. Both of the younger boys confirmed that Father would get mad and

pull the hair of the mother and that he hit the mother in their presence.

(Emphasis added.)

28. Paragraph 51 of the decision states:

> 51. On August 18, 1999, [John Doe 1] and [John Doe 2] were removed from the family home by [DHS]. At that time [Mother] was offered the option of removing herself and the boys to a safe place at a domestic abuse shelter. [Mother] elected to remain with Father even though this caused the younger boys to be placed in foster care....

visiting the Children, several times after a protective order was issued by the court prohibiting such contact without DHS consent,[29] (3) the order prohibited Father from visiting the children when intoxicated,[30] and (4) during one of these protective order violations, Father was intoxicated.[31]

As already stated, and as was testified to during the proceedings, John Doe 1 and John Doe 2 suffered severe psychological trauma as a result of observing Father's acts of spousal violence.[32] Mother did nothing to extricate herself or her children from the family home when given the opportunity to do so. We are not unmindful of the psychological dependence Mother had on Father.[33] However, children's welfare was of utmost priority and Mother was obligated to prevent the threat of physical violence or psychological injury to them. *See* HRS § 587–11 (1993) (providing for jurisdiction over child protective proceedings in cases where the facts "constitute the basis for the finding that the child is a child whose physical or psychological health or welfare is subject to imminent harm, has been harmed, or is subject to threatened harm by the *acts or omissions* of the child's family" (emphasis added)).

Additionally, assuming Mother was not a witness to Father's violent acts toward the children, she was, as DHS argues, informed of these events and chose to allow Father to violate the domestic protective order. Because Father's violent behavior was often precipitated by his alcohol abuse, and Mother did nothing to assist in enforcing the protective order, she risked the children's welfare. Mother's disregard of the protective order reflects that her omission (*i.e.,* her refusal to contact the police or DHS), and her action (*i.e.,* her apparent support of Father's violation of the protective order), threatened the children's physical and psychological safety. In allowing Father to see the Children in violation of the order and on one noted occasion while Father was intoxicated, Mother's acts and/or omissions threatened harm to the Children.

## VIII.

We next turn to Father's remaining contentions.

### A.

Father maintains that HRS § 587–11 is "overbroad" and violates his due pro-

29. Paragraph 54 of the decision states:
 54. Subsequently Father visited the family home on at least two occasions without the knowledge or consent of [DHS].

30. Paragraph 53 of the decision states:
 53. On September 2, 1999, Father and [Mother] appeared in court again in this proceeding. At that time the two younger boys were returned to their mother under family supervision. *A domestic protective order was issued to Father which ordered him to vacate the home and to have contact with the younger boys only as arranged by [DHS]. [Father] was also ordered not to visit the children while under the influence of alcohol....*

31. The court found as follows:
 55. *On the day before Halloween in 1999, Father and [Mother] had a barbecue party at their home and violated the domestic protective order. The two younger boys were present. Father drank beer and became intoxicated.*
 56. *On November 1, 1999 at a pretrial conference, [DHS] reported that [John Doe 1] and [John Doe 2] had made statements that they had been seeing Father without supervision by [DHS].* [DHS] removed the younger boys from the family home and placed them back into temporary foster custody on the same day.
 (Emphases added.)

32. The court found:
 43. The return of [Mother] did not bring peace to the family. [Mother] also drank beer frequently, although she didn't drink as much as Father. The fighting between Father and [Mother] resumed upon her return. The couple engaged in frequent long, loud arguments. Father pushed and slapped [Mother] and she would flee crying to [a neighbor] in the downstairs duplex. At times [Mother] spent the night with [the neighbor] after violent arguments.
 ....
 46. In the summer of 1999, Father and [Mother] had an argument. *Father was intoxicated and he cut the leg of [Mother] twice with a knife.* [Mother] fled downstairs to [the neighbor] and [Jane Doe] yelling, "[Father], that asshole cut me with a knife." [The neighbor] and [Jane Doe] bandaged the wound. *By the end of the day, [Father] and [Mother] were back together drinking again.*
 (Emphases added.)

33. The court found that Mother "is very dependent on her husband."

cess rights because it allows consideration of acts committed abroad that may have been legal where committed. Father's Opening Brief states that

> the State of Hawaii had no power to restrict Father's actions while he was a[n] expatriate in Japan, having never have lived in Hawaii. And, clearly while Father lived in Japan the Department of Human Services had no jurisdiction to intervene in his life. Subsequently, HRS § [ ]587–11 is over broad in that it allows the Family Court to take jurisdiction where a child is found in the State of Hawaii and the facts are reported to have occurred outside this State.[34]

The states are vested with the power "to enact laws [such as HRS § 587–11], within constitutional limits, to promote the order, safety, health, morals, and general welfare of society." [35] *State v. Guzman*, 89 Hawai'i 27, 43, 968 P.2d 194, 210 (App.1998), (quoting *Godbold v. Manibog*, 36 Haw. 206, 214–15, *reh'g denied*, 36 Haw. 230 (1942)). In that connection, "[g]overnment interference with the right of parents to nurture and to manage their children has been grounded upon . . . the state's general police power to protect and promote public welfare[.]" *In re Christine M.*, 157 Misc.2d 4, 595 N.Y.S.2d 606, 611 (N.Y.Fam.Ct.1992) (citing *Santosky v. Kramer*, 455 U.S. 745, 766, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (other citation omitted).)

■■■ A state's exercise of its police power extends to its territorial boundaries. *See, e.g., Hawai'i Laborers' Trust Funds v. Maui Prince Hotel*, 81 Hawai'i 487, 501, 918 P.2d 1143, 1157 (1996) (explaining that state's police power to protect its residents includes power to "protect workers *within the State*"

(Emphasis added)). The courts of a state are vested with the power to hear a case, *i.e.*, are vested with subject matter jurisdiction, if the act at issue occurred within the territorial boundaries of the state or if the act transpired outside of the state but resulted in harm within it. *See State v. Meyers*, 72 Haw. 591, 593, 825 P.2d 1062, 1064 (1992) (the assertions of subject matter jurisdiction over acts or harm occurring within the state comports with constitutional due process); *Pele Defense Fund v. Puna Geothermal Venture*, 77 Hawai'i 64, 67, 881 P.2d 1210, 1213 (1994) ("Subject matter jurisdiction is concerned with whether the court has the power to hear a case." (Internal quotation marks and citations omitted.)).

■■■ HRS § 587–11 describes the family court's subject matter jurisdiction with respect to harm or threatened harm to a child.[36] "[T]he primary focus of the court's jurisdiction under HRS § 587–11 "is to prevent harm to the child." *In re Doe*, 96 Hawai'i at 285, 30 P.3d at 891. HRS § 571–11 grants the family courts subject matter jurisdiction over children who are or were within the territorial boundaries of the state when their "physical or psychological health or welfare" was "subject to imminent harm," "threatened [with] harm," or "harmed." Several of Father's harmful acts occurred within the state, in particular, his choking of John Doe 1, his use of a stick against John Doe 2, and the resulting harm and threatened harm to the children from his repeated alcohol abuse. Because the court's pertinent findings and orders are based on harm that occurred *within the state* and *the threat of harm* that also exists *within the state*, the court had subject matter jurisdiction over

---

34. In his opening brief, Father contends that the court erroneously relied on paragraphs 12–15. Paragraph 12 states, "While the family lived in Japan ... Father ... attacked [John Doe 1] and struck him with his fists and kicked him in the stomach[.]" Paragraph 13 states, "Father repeatedly physically abused [Mother] in Japan...." Paragraphs 14 and 15 relate solely to Jane Doe. Although not pointed out by Father, we note that paragraphs 16 and 17 also involve Father's behavior outside of Hawai'i. Those paragraphs indicate that, in California, the police intervened in the couple's marital disputes and

that, when Mother moved back to the Marshall Islands, Father left the children unsupervised and the children were not registered at any school.

35. The tenth amendment to the United States Constitution states that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

36. *See supra* note 3.

this case.[37] Accordingly, the harm to the children and threatened harm to them, along with Father's related in-state conduct, were sufficient to support subject matter jurisdiction and the resulting order granting foster custody to DHS.

■ The court also had personal jurisdiction over Father because he was within the territorial boundaries of the court's jurisdiction. *See International Shoe Co. v. Washington*, 326 U.S. 310, 315, 66 S.Ct. 154, 90 L.Ed. 95 (1945) ("Historically the jurisdiction of courts to render judgment in personam is grounded on their de facto power over the defendant's person. Hence his [or her] presence within the territorial jurisdiction of court was prerequisite to its rendition of a judgment personally binding him [or her]." (Citation omitted)). Because Father resided in Hawai'i and was present during this action, the court had personal jurisdiction over Father.

### B.

■ The fact that certain matters occurring outside of the State were considered by the court did not violate Father's due process rights. The court's consideration of pertinent matters is not restricted to events occurring only in Hawai'i.[38] The safe family home guidelines outlined in HRS § 587–25 indicate that among the factors to be considered when determining whether parents are

able to provide their children with a safe family home are "[h]istorical facts relating to the alleged perpetrator and other appropriate family members who are parties" and "[w]hether there is a history of abusive or assaultive conduct by the child's family." Furthermore, HRS § 587–71 explains that, at a disposition hearing, "the court may consider the evidence which is relevant to disposition which is in the best interests of the child.... The court shall consider all relevant prior and current information pertaining to the safe family home guidelines...." Plainly, HRS §§ 587–25 and –71 authorize the family courts to consider the history of a parent-child relationship. Nothing in the statutes limits that examination to instances of conduct within Hawai'i, if subject matter and personal jurisdiction otherwise exist.[39]

### IX.

■ Father claims that the extended period of time to complete the case violated his procedural due process rights. He admits, however, that "the legislature did not set specific guidelines for the length of time it should take to complete the adjudication process" and that he agreed to allow the adjudication to begin beyond the statutory start-time outlined in HRS § 587–62.[40] Specifically, Father's attorney stated at the continued return date hearing, "Well, actually, you know what my concern is, is having adequate

---

**37.** Paragraph 59 states, "All of the minor children in the family are subject to a reasonable foreseeable substantial *risk of harm* by domestic violence or inappropriate discipline due to Father's violent conduct. The *risk of harm is exacerbated* by Father's frequent abuse of alcohol." (Emphases added.)

**38.** Father apparently asserts that the out-of-state incidents were not reported in Hawai'i. However, each of the incidents relied upon in the court's conclusions were reported by the children when they were in Hawai'i and in fact occurred in Hawai'i. Specifically, in Paragraph 58, the court determined that Father subjected his children to harm based on the choking of John Doe 1 and the striking of one of the younger boys with a stick. Both of these acts occurred in Hawai'i. Similarly, the manifestation of 'psychological trauma in the form of bed-wetting occurred in Hawai'i, as did Father's abuse of alcohol. Also, other events, though they occurred out-of-state, were *reported* in Hawai'i.

**39.** We are not faced here with a record in which the court's custody order is premised on acts established as legal in a foreign jurisdiction.

**40.** HRS § 587–62 states in pertinent part:

(a) When a petition has been filed, the court shall set a return date to be held within fifteen days of (1) the filing of the petition ....

(b) On the return date, the court shall preside over a pretrial conference and may order that:

....

(4) If the parties do not stipulate to orders of adjudication and foster custody or family supervision ... the court shall set the case for an adjudication hearing or a disposition hearing within ten working days of the return date, unless ... *the later date is agreed to by all the parties and is approved by the court.*

(Emphasis added.)

542

time to prepare a defense.... And I think we might be willing, as long as the children are going back to mom, to waive the 15–day requirement and maybe set this for maybe 30 days, 30 to 45 days." He subsequently agreed that "six weeks or so should give us time to prepare," and at one point was unwilling to accept an earlier trial date because it was "too soon." Father's attorney agreed to at least one other delay caused by a scheduling conflict for the guardian ad litem. Because Father himself moved for a later trial date and agreed to at least one of the continuances, he cannot now claim a due process violation based on delay.

### X.

For the foregoing reasons, we affirm the court's May 22, 2000 order and amended orders filed on June 19, June 30, July 14, and August 16, 2000 and the July 31, 2000 order denying reconsideration.