***FOR PUBLICATION IN WEST’S HAWAI#I REPORTS AND PACIFIC REPORTER***

 Electronically Filed
 Supreme Court
 SCWC-12-0000521
 06-JAN-2014
 09:22 AM

 IN THE SUPREME COURT OF THE STATE OF HAWAI#I

 ---o0o---

 IN THE INTEREST OF TM

 SCWC-12-0000521

 CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
 (CAAP-12-0000521; FC-S NO. 10-002K)

 January 6, 2014

 RECKTENWALD, C.J., NAKAYAMA, ACOBA, McKENNA, AND POLLACK, JJ.

 OPINION OF THE COURT BY ACOBA, J.

 We hold that the failure of the Family Court of the

Third Circuit1 (the court) to appoint counsel for Petitioner/

Mother-Appellant Jane Doe (Petitioner) until nearly nineteen

months after Respondent-Appellee Department of Human Services

(DHS) filed a Petition for Temporary Foster Custody over

Petitioner’s son, T.M. constituted an abuse of discretion under

 1
 The Honorable Aley K. Auna, Jr. presided.
 ***FOR PUBLICATION IN WEST’S HAWAI#I REPORTS AND PACIFIC REPORTER***

Hawai#i Revised Statutes (HRS) § 587-342 (2006) and § 587A-173

(Supp. 2012) which necessitates vacating the court’s April 17,

2012 Order “Terminating [Petitioner’s] Parental Rights and

Awarding Permanent Custody” to DHS.4 We recognize that parents

have a substantive liberty interest in the care, custody, and

control of their children that is protected by the due process

clause of article I, section 5 of the Hawai#i Constitution.5 In

 2
 HRS § 587-34 provided in relevant part as follows:

 The court may appoint . . . independent counsel for any []
 party if the party is an indigent, counsel is necessary to
 protect the party’s interests adequately, and the interests
 are not represented adequately by another party who is
 represented by counsel.

(Emphasis added)

 3
 HRS § 587A-17 provides in relevant part as follows:

 The court may appoint an attorney to represent a legal
 parent who is indigent based on court-established
 guidelines. The court may also appoint an attorney to
 represent another indigent party based on court-established
 guidelines, if it is deemed to be in the child’s best
 interest. Attorneys who are appointed by the court to
 represent indigent legal parents and other indigent
 qualifying parties may be paid by the court, unless the
 legal parent or party for whom counsel is appointed has an
 independent estate sufficient to pay such fees and costs.
 The court may order the appropriate legal parent or party to
 pay or reimburse the fees and costs of an attorney appointed
 for the child or incapacitated adult.

(Emphasis added.)

 4
 HRS § 587-34 was replaced by HRS § 587A-17 on September 1, 2010.
Thus, HRS § 587-34 applied during the initial hearings in January, 2010, but
HRS § 587A-17 applied during the subsequent hearings.

 5
 Article I, section 5 of the Hawai#i Constitution provides as
follows:

 Section 5

 No person shall be deprived of life, liberty or property
 without due process of law, nor be denied the equal

 2
 ***FOR PUBLICATION IN WEST’S HAWAI#I REPORTS AND PACIFIC REPORTER***

re Doe, 99 Hawai#i 522, 533, 57 P.3d 447, 458 (2002). Therefore,

we additionally hold that parents have a constitutional right to

counsel under article I, section 5 in parental termination

proceedings and that from and after the filing date of this

opinion, courts must appoint counsel for indigent parents once

DHS files a petition to assert foster custody over a child.

 For the reasons set forth herein, the aforesaid April

17, 2013 Order of the Court, the “Findings of Fact [(findings)]

and Conclusions of Law [(conclusions)] re [Termination of

Parental Rights (TPR)] Hearing” entered on May 3, 2012, and the

July 26, 2013 judgment of the Intermediate Court of Appeals (ICA)

filed pursuant to its June 28, 2013 Summary Disposition Order

affirming the court’s order are vacated, and the case is remanded

for a new hearing.

 I.

 A.

 T.M. was born to Petitioner on June 8, 2009, when

Petitioner was fifteen years old. In August, 2009, Petitioner

was “diagnosed with Psychotic Disorder, Bipolar [Disorder], Panic

Disorder, and Adjustment Disorder with Mixed Disturbance

Emotions/Conduct.” DHS filed two Petitions for Temporary Foster

 protection of the laws, nor be denied the enjoyment of the
 person’s civil rights or be discriminated against in the
 exercise thereof because of race, religion, sex or ancestry.

(Emphasis added.)

 3
 ***FOR PUBLICATION IN WEST’S HAWAI#I REPORTS AND PACIFIC REPORTER***

Custody, one over Petitioner and one over T.M., on January 6,

2010.

 On January 7, 2010, the court held a hearing on the DHS

petition. At the hearing, the court advised both Petitioner’s

parents and Petitioner herself of the salutary purpose of having

a court-appointed attorney:
 [The Court]: You all, the parents, have an opportunity to
 either agree or disagree with the allegations. If you
 disagree, that’s fine. I mean, you know, I’m not holding
 anything against anyone until the evidence is presented and
 I have to make a decision. It’s always wise, however, when
 children are in temporary out-of-home placement, that you
 have the benefit of having an attorney help you.

 And if you cannot afford an attorney, then the Court may
 appoint an attorney to represent you at no cost to you. All
 I would need is an application to be completed. I’ll review
 it, and if you qualify financially, I will appoint an
 attorney to represent you. That’s always a good idea only
 because there’s a lot of legal things that happen in the
 courtroom that you may not be aware of or familiar with, and
 having an attorney by your side is always a great benefit.

 You may choose to represent yourself if you wish. That’s
 fine, and I will try my best to help -- or let you know
 what’s happening. I cannot give you legal advice, but at
 least I can kind of give you your options, and you make your
 decisions on what you want to do. You may, if you wish,
 hire your own attorney. That’s up to you, but that will be
 at your cost. So there’s a couple of options.

(Emphases added.) The court stated it would attempt to find one

person to act both as guardian ad litem and as an attorney for

Petitioner but suggested that having separate persons act as a

guardian ad litem and as an attorney might be necessary:
 Now, [Petitioner], her situation is a little different, and
 that is because she’s a minor under the law, she’s entitled
 to a guardian ad litem. At the same time she is a mother, a
 parent, and so she’s entitled to an attorney. I’m going to
 try my best to find a person that can act in both
 responsibilities. There may be, though, the situation where
 she will have both an attorney and a guardian ad litem, two
 people, because what the guardian ad litem may feel would be

 4
 ***FOR PUBLICATION IN WEST’S HAWAI#I REPORTS AND PACIFIC REPORTER***

 in her best interest may not be what she would like. So
 that’s why she would need an attorney.

(Emphasis added.) The record does not indicate that Petitioner

submitted an application for court-appointed counsel at that

point.

 Following the hearing, the court approved court-

appointed counsel for Petitioner’s mother and T.M.’s father.6

However, the court did not appoint counsel for Petitioner.

Instead, the court apparently had Stephanie St. John (St. John)

act as Petitioner’s guardian ad litem. At the next hearing, on

January 14, 2010, the court suggested that St. John was serving

both as Petitioner’s guardian ad litem and Petitioner’s

attorney:7
 THE COURT: Okay. Very well. Ms. St. John, you’re pretty
 much playing a dual role here.
 MS. ST. JOHN: Well, that’s my first thing, your Honor, is
 that at this point understanding that I haven’t spoken with
 [Petitioner] yet, and I need to speak with her about this
 stuff because if there’s going to be a difference of opinion
 in working as a guardian ad litem than working as her
 attorney, then I would be suggesting that she have a
 separate attorney to deal with her as a mother over [T.M].
 But at this point I haven’t spoken with her to find out
 whether or not there is any conflict between those two
 positions.

(Emphases added.) But, as indicated above, St. John did not

confirm that she was serving as Petitioner’s attorney. Instead,

 6
 No attorney was appointed for Petitioner’s father.

 7
 The “Ohana Conference Report #1” described St. John as
“[Petitioner’s guardian at litem] as well as her assigned attorney at this
time[.]” An Ohana Conference is apparently a conference between DHS, the
parties, and other resource persons for the family such as therapists or
caregivers regarding future proceedings in the case.

 5
 ***FOR PUBLICATION IN WEST’S HAWAI#I REPORTS AND PACIFIC REPORTER***

St. John told the court that there might be a conflict in serving

in both capacities and she would “speak with [Petitioner]” to

determine if Petitioner desired to have “a separate attorney”.

 According to finding 7 of the court’s May 3, 2013

findings and conclusions, “[f]amily court jurisdiction over

[T.M.] and his parents [including Petitioner] was established at

[the] hearing on February 10, 2010. Foster custody was awarded

to the [DHS]. For purposes of the Child Protective Act, [T.M.’s]

date of entry into foster care was February 10, 2010.” (Emphasis

in original.)

 B.

 A service plan hearing8 was held on March 3, 2010. The

Family Service Plan established the “initial goal” as

“[m]aintain[ing] [T.M.] in placement or in a safe family home

with his mother, [Petitioner],” and the “reunification of

[Petitioner] with her mother, or her father and his fiancé.” The

“final goal” was to “[m]aintain [Petitioner] and . . . [T.M.] in

 8
 The “service plan hearing” was apparently a “disposition hearing”
pursuant to HRS § 587-71 (Supp. 2006). Under the then-controlling statutory
scheme, once the ability of the family court to adjudicate a case was
established, the case was required to “be set for a further disposition
hearing concerning an appropriate service plan.” HRS §§ 587-62(3), (4) (Supp.
2006).
 At the disposition hearing, the court was required to, inter alia,
“order [such] terms, conditions, and consequences to constitute a service plan
as the court determines to be in the best interests of the child.” HRS § 587-
71(I). A “service plan” is “a specific written plan prepared by an authorized
agency” setting forth, inter alia, “[t]he steps that will be necessary to
facilitate the return of the child to a safe family home.” HRS § 587-26
(Supp. 2006).

 6
 ***FOR PUBLICATION IN WEST’S HAWAI#I REPORTS AND PACIFIC REPORTER***

a safe family home without the need for further DHS

intervention.” The family plan stated that the “target date” to

“maintain [Petitioner] and her son, [T.M.] in a safe family home

without the need for further DHS intervention” was February 2011.

 The Plan provisions required Petitioner to “continue to

participate in services provided by [the Department of Health,

Family Guidance Center], including compliance with any prescribed

medication,” and “to make efforts to complete [her] education via

attendance at school, work on correspondence courses, and

participation in the [] Grads Program.”9 The Plan was to “remain

in effect until August 23, 2010, or further order of the court.”

The Plan also set forth “consequences,” which explained to

Petitioner that “your parental and custodial duties and rights

concerning . . . [T.M.] . . . may be terminated by an award of

permanent custody unless you are willing and able to provide . .

. [T.M.] with a safe family home within the reasonable period of

time specified in this family service plan.”

 However, no provision of the Plan specified the

“reasonable period of time” in which Petitioner was required to

provide T.M. with a safe family home. The Ohana conference

report stated that “if the parents are unable to provide the

children with a safe family home within a reasonable period of

 9
 The Grads program is “a special program for teen mothers that
enable those mothers to attend high school and look after their babies on
campus.”

 7
 ***FOR PUBLICATION IN WEST’S HAWAI#I REPORTS AND PACIFIC REPORTER***

time up to one year, even with a service plan, parental rights

may be subject to termination.” However, at the time the service

plan was filed, although HRS § 587-72 (2006) did allow DHS to

file a motion for a permanent plan hearing if the child was

outside the family home for twelve consecutive months, parents

could prevail at that hearing by demonstrating that it was

“reasonably foreseeable” that they would be able to provide the

child with a safe family home in “a reasonable period of time

which shall not exceed two years from the date upon which the

child was first placed under foster custody by the court.” HRS §

587-73 (2006) (emphasis added). This two-year requirement is

also reflected in present Hawai#i law. HRS § 587A-33(a)(2)

(Supp. 2012).

 Petitioner was apparently found to have possessed

marijuana on November 30, 2010. The terms of her probation

included the requirement that she “shall not consume or possess

any alcoholic beverages, illegal drugs, non-prescribed

prescription drugs, or drug paraphernalia.”

 A combined second periodic review hearing and

permanency hearing10 was held on January 26, 2011. At a

 10
 HRS § 587A-31 (Supp. 2012) provides in relevant part as follows:

 (a) A permanency hearing shall be conducted within twelve
 months of the child’s date of entry into foster care or
 within thirty days of a judicial determination that the
 child is an abandoned infant or that aggravated
 circumstances are present. A permanency hearing shall be

 8
***FOR PUBLICATION IN WEST’S HAWAI#I REPORTS AND PACIFIC REPORTER***

 conducted at least every twelve months thereafter for as
 long as the child remains in foster care under the placement
 responsibility of the department or an authorized agency, or
 every six months thereafter if the child remains in the
 permanent custody of the department or an authorized agency.

 (b) The court shall review the status of the case to
 determine whether the child is receiving appropriate
 services and care, that case plans are being properly
 implemented, and that activities are directed toward a
 permanent placement for the child.

 (c) At each permanency hearing, the court shall make written
 findings pertaining to:
 (1) The extent to which each party has complied with the
 service plan and progressed in making the home safe;
 (2) Whether the current placement of the child continues to
 be appropriate and in the best interests of the child or if
 another in-state or out-of-state placement should be
 considered;
 (3) The court’s projected timetable for reunification or, if
 the current placement is not expected to be permanent,
 placement in an adoptive home, with a legal guardian, or
 under the permanent custody of the department or an
 authorized agency;
 . . . .
 (d) At each permanency hearing, the court shall order:
 (1) The child’s reunification with a parent or parents;
 (2) The child’s continued placement in foster care, where:
 (A) Reunification is expected to occur within a time frame
 that is consistent with the developmental needs of the
 child; and
 (B) The safety and health of the child can be adequately
 safeguarded; or
 (3) A permanent plan with a goal of:
 (A) Placing the child for adoption and when the department
 will file a motion to set the matter for the termination of
 parental rights;
 (B) Placing the child for legal guardianship if the
 department documents and presents to the court a compelling
 reason why termination of parental rights and adoption are
 not in the best interests of the child; or
 (C) Awarding permanent custody to the department or an
 authorized agency, if the department documents and presents
 to the court a compelling reason why adoption and legal
 guardianship are not in the best interests of the child.
 . . .
 (g) If the child has been in foster care under the
 responsibility of the department for a total of twelve
 consecutive months or an aggregate of fifteen out of the
 most recent twenty-two months from the date of entry into
 foster care, the department shall file a motion to terminate
 parental rights, unless:
 (1) The department has documented in the safe family home
 factors or other written report submitted to the court a

 9
 ***FOR PUBLICATION IN WEST’S HAWAI#I REPORTS AND PACIFIC REPORTER***

permanency hearing, “[t]he court shall review the status of the

case to determine whether the child is receiving appropriate

services and care, that case plans are being properly

implemented, and that activities are directed toward a permanent

placement for the child.” HRS § 587A-31(b). Under HRS § 587A-

31, one of the options at a permanency hearing is for the court

to order “the child’s continued placement in foster care” if,

inter alia, “[r]eunification is expected to occur within a time

frame that is consistent with the developmental needs of the

child.” HRS § 587A-31(d).

 On January 21, 2011, DHS formulated a revised family

service plan. The revised plan added the provision that

[Petitioner] “[f]ollow all the requirements of her probation,

including additional treatment needs such as substance abuse

treatment, etc.”

 At the January 26, 2011 hearing both DHS and T.M.’s

guardian ad litem, Susan M. Kim (Kim), “recommended that

[Petitioner] be given more time to reunify with her son.” This

recommendation was consistent with the goals of the family plan,

 compelling reason why it is not in the best interest of the
 child to file a motion; or
 (2) The department has not provided to the family of the
 child, consistent with the time period required in the
 service plan, such services as the department deems
 necessary for the safe return of the child to the family
 home.

(Emphases added.)

 10
 ***FOR PUBLICATION IN WEST’S HAWAI#I REPORTS AND PACIFIC REPORTER***

i.e., to reunify Petitioner with either her mother or father and

to reunify T.M. with Petitioner.

 At the hearing, St. John noted that she disagreed with

Petitioner regarding Petitioner completing a therapeutic home

process:
 I have to state this because as her guardian ad litem, I
 have to notify the Court that what I’m going to say is
 different from what she wants, and I know that she wants to
 go home to mom.

 The problem is that my recommendation would be for her to
 complete her therapeutic home process.

The court informed Petitioner that she needed to accept more

responsibility for the care of T.M. The court also approved the

revised “family service plan dated January 21st, 2011,” and

entered an order finding that “[t]he parents of [T.M.] [including

Petitioner] have partially complied with the Family Service Plan.

They have only made limited progress toward making their

respective homes safe for [T.M.]”

 The court order concluded that “each party present at

the hearing understands that unless the family is willing and

able to provide the child(ren)11 with a safe family home, even

with the assistance of a service plan, within a reasonable period

of time stated in the service plan, their parental and custodial

duties and rights shall be subject to termination.” (Emphases

 11
 The court order refers to “children” because both Petitioner and
T.M. were minors at the time of the hearing.

 11
 ***FOR PUBLICATION IN WEST’S HAWAI#I REPORTS AND PACIFIC REPORTER***

added.) The service plan did not define “a reasonable period of

time[.]”

 A combined third periodic review hearing and permanency

hearing was held on May 24, 2011. At the hearing, DHS advised

that “given the time that’s passed so far,” it “would like to go

ahead and set a [termination of] parental rights [(TPR)]

hearing.”12 However, DHS agreed to wait to set the TPR motion

 12
 HRS § 587A-33 (Supp. 2012) provides in relevant part as follows:

 § 587A-33 Termination of parental rights hearing.

 (a) At a termination of parental rights hearing, the court
 shall determine whether there exists clear and convincing
 evidence that:
 (1) A child’s parent whose rights are subject to termination
 is not presently willing and able to provide the parent’s
 child with a safe family home, even with the assistance of a
 service plan;
 (2) It is not reasonably foreseeable that the child’s parent
 whose rights are subject to termination will become willing
 and able to provide the child with a safe family home, even
 with the assistance of a service plan, within a reasonable
 period of time, which shall not exceed two years from the
 child’s date of entry into foster care;
 (3) The proposed permanent plan is in the best interests of
 the child. In reaching this determination, the court shall:
 (A) Presume that it is in the best interests of the child to
 be promptly and permanently placed with responsible and
 competent substitute parents and family in a safe and secure
 home; and
 (B) Give greater weight to the presumption that the
 permanent plan is in the child’s best interest, the younger
 the child is upon the child’s date of entry into foster
 care; and
 . . .
 (b) If the court determines that the criteria set forth in
 subsection (a) are established by clear and convincing
 evidence and the goal of the permanent plan is for the child
 to be adopted or remain in permanent custody, the court
 shall order:
 (1) That the child’s parent’s parental rights be terminated;
 (2) Termination of the existing service plan and revocation
 of the prior award of foster custody;
 (3) That permanent custody of the child be awarded to an
 appropriate authorized agency;
 (4) An appropriate permanent plan; and

 12
 ***FOR PUBLICATION IN WEST’S HAWAI#I REPORTS AND PACIFIC REPORTER***

until September. The court then stated that it would set a

hearing for September 13, 2011. The court explained that “that’s

not a trial date.”

 Instead, the court related that “[t]hat’s a date to

find out where we’re going to go. The state’s going to file

their motion to terminate parental rights. We’ll hear that

motion at that time.” St. John then asserted that an attorney

was needed to represent Petitioner with regard to T.M. because

Petitioner had “never been assigned . . . an attorney in her case

involving [T.M.]”:
 MS. ST. JOHN: 8:30 a.m. . . . [B]ecause I am only

 (5) The entry of any other orders the court deems to be in
 the best interests of the child, including restricting or
 excluding unnecessary parties from participating in adoption
 or other subsequent proceedings.
 . . .
 (d) A family member may be permitted visitation with the
 child at the discretion of the permanent custodian. The
 court may review the exercise of such discretion and may
 order that a family member be permitted such visitation as
 is in the best interests of the child.
 . . .
 (h) If the court determines that the criteria set forth in
 subsection (a) are not established by clear and convincing
 evidence, the court shall order:
 (1) The preparation of a plan to achieve permanency for the
 child;
 (2) The entry of any orders that the court deems to be in
 the best interests of the child;
 (3) A periodic review hearing to be held within six months
 after the date of the last permanency hearing; and
 (4) A permanency hearing to be held within twelve months of
 the date of the last permanency hearing.
 (I) Absent compelling reasons, if the child has been in
 foster care under the department’s responsibility for an
 aggregate of fifteen out of the most recent twenty-two
 months from the date of entry into foster care, the
 department shall file a motion to terminate parental rights.

(Emphases added.)

 13
 ***FOR PUBLICATION IN WEST’S HAWAI#I REPORTS AND PACIFIC REPORTER***

 [Petitioner’s guardian ad litem] -- and I’ve mentioned this
 several times in this case. She has never been assigned
 anybody as her attorney in her case involving her child,
 [T.M.]. If we are going to permanency at this point and
 [Petitioner] is going to be turning 18, the suggestion is
 that she apply for and look at getting her own attorney for
 that case.
 THE COURT: Okay. Well, maybe perhaps you can assist her in
 that, I mean filling out the application. Okay?
 MS. ST. JOHN: Sure.

(Emphasis added.)

 On May 25, 2011 DHS filed its Motion to Set TPR

Hearing, because “[T.M.] has been in foster care . . . for an

aggregate of fifteen out of the most recent twenty-two months

from the date of entry into foster care.” On about August 31,

2011, an application for court-appointed counsel was submitted.

The application was signed by Petitioner on August 31, 2011,

prior to her eighteenth birthday.

 C.

 At a combined permanency hearing and termination of

parental rights hearing on September 13, 2011, Petitioner still

was not represented by counsel. The court noted that it had

received Petitioner’s application for counsel, but wanted to

check with the DHS to see if the case would be resolved by mutual

agreement before appointing an attorney. DHS informed the court

of a possible agreement with Petitioner whereby T.M.’s current

foster mother (foster mother) would become his legal guardian,

and Petitioner’s parental rights would not be terminated.

However, DHS explained that before it could commit to that

 14
 ***FOR PUBLICATION IN WEST’S HAWAI#I REPORTS AND PACIFIC REPORTER***

agreement, it was “required to check out relatives who may be

interested in guardianship or adoption.” DHS also asserted that

it believed “it would be best to have an attorney for

[Petitioner],” because “this is a pretty important juncture of

the case.”

 The court then asked St. John if there would be a

conflict were she appointed attorney for Petitioner. St. John

replied that such an appointment would be a conflict of interest:
 MS. ST. JOHN: Your Honor, at this point I believe that it is
 a conflict. There are a lot of different things that
 [Petitioner] has basically not followed through with as a
 mother to her son, and I don’t feel that where my position
 as to what’s in her best interest really coincides with what
 she needs to be doing as an adult and as a mother and for
 somebody to advocate for her.

 The other thing too is that when we discussed this at the
 ohana conference, I was very concerned that she wasn’t
 really listening to what the attorneys and the social
 workers were telling her in the hearing that she needed to
 hear. I think she really does need to sit down with
 somebody as an attorney for her . . . and get the advice
 that she needs as a mother dealing with her child, given her
 and her struggles through her teenage stuff that she’s been
 doing these past couple of years.

(Emphases added.) The court ruled that it “would go ahead and

appoint an attorney to represent [Petitioner].” On September 13,

2011, an order was issued appointing Joan Jackson (Jackson) as

counsel for Petitioner.

 On September 20, 2011, the court again held a combined

periodic review hearing and termination of parental rights

hearing “for tracking purposes only.” Jackson appeared for the

first time at the hearing. DHS explained that it was “going to

 15
 ***FOR PUBLICATION IN WEST’S HAWAI#I REPORTS AND PACIFIC REPORTER***

be checking out some relatives to see if they’re interested in a

long-term caretaker for the child.” According to DHS, “if the

relatives don’t pan out, then we’d be looking at the foster

parent as being the guardian for this child, and that would be

without terminating parental rights.” The court however, wanted

to “do the termination of parental rights now” and explained that

it “appointed [Jackson] so that she could explain to her client

that option.”

 Jackson, however, related that she had “just met with

[Petitioner] this morning,” and “didn’t discuss with her

termination of parental rights because [Jackson] didn’t think

that [was] the way the case was going.” When the court again

questioned Jackson regarding Petitioner’s willingness to

terminate parental rights, Jackson reiterated that she “didn’t

really discuss it with [Petitioner],” and did not want to

“whisper[] about it for a moment in court.”

 The hearing concluded to allow DHS to investigate

placement of T.M. with relatives. With regard to the potential

guardianship, the court noted that foster mother was the “only .

. . psychological family” that T.M. knew, and that it might have

an impact having the child leave foster mother for a “stranger.”

DHS stated that “the whole family liked” the option of allowing

T.M. to remain with foster mother as a guardian.

 16
 ***FOR PUBLICATION IN WEST’S HAWAI#I REPORTS AND PACIFIC REPORTER***

 On October 4, 2011, DHS reported that there were

possible problems with the two relatives they had targeted to

potentially adopt T.M. Petitioner’s father’s sister was not an

option because of financial difficulty. Further, T.M.’s paternal

aunt and uncle (aunt and uncle) had not returned calls from DHS.

The hearing concluded with both Petitioner and DHS stating that

they wanted to pursue a guardianship with foster mother.

 Following the October 4, 2011 hearing, aunt and uncle

apparently stated that they were willing to adopt T.M. At an

Ohana Conference, foster mother “decided that she would like to

be considered as [an] alternative option, and that the primary

option should be [T.M.]’s adoption by [aunt and uncle.]” Because

foster mother indicated she would be the second option, DHS made

“adoption of [T.M.] by his aunt and uncle the first choice for

the Permanent Plan” and no longer pursued placement with foster

mother. According to DHS, T.M. would therefore be adopted

instead of placed in a guardianship and DHS would seek to

terminate Petitioner’s parental rights. Petitioner was required

to show that she could provide a safe family home for T.M.

herself in order for reunification to occur.

 On December 13, 2011, a periodic review hearing was

held. At the hearing, the court noted that “we’re switching now

to adoption.” Petitioner requested that the TPR hearing be

postponed:

 17
 ***FOR PUBLICATION IN WEST’S HAWAI#I REPORTS AND PACIFIC REPORTER***

 [Jackson]: Now the case is about her son. So [Petitioner]
 really now does not want to lose her child and does not want
 to have her parental rights terminated. And because she’s
 been an adult herself for just a couple of months, we’re
 asking the Court for a little more time so that [Petitioner]
 can do what she needs to do to provide a home for herself
 and her son. She is presently going to substance abuse
 treatment three times a week and will be going into the
 women’s program, the in-patient BISAC program, when a bed
 becomes available.

 At this point we’d ask the Court not to set a hearing to
 terminate parental rights but to give mother a little more
 time to show everyone in this room and the Court that she is
 able and willing and ready to be a full-time parent for
 [T.M.] because obviously [T.M.] can’t wait for anybody else
 to get their life together. However, the child is very,
 very happy with the foster mother. He’s actually, according
 to everyone who spoke at the ohana conference, a very well-
 adjusted, happy child, who knows who all of his relatives
 are and feels loved by all these people. But I think it
 would be very difficult and sad for [T.M.] to suddenly be
 moved to a different home and lose contact with his mother.
 So I’m asking the Court for a little more time so that
 Petitioner can do what she needs to do to provide a home for
 herself and her son.

(Emphases added.) The court recounted that “we have a deadline

to meet according to the statute, two years from the date of

entry into foster care.” According to the court, “what that

means for the parents is that unless you can have the child back

in your home within that two-year mark . . . the child goes

elsewhere permanently.”13 The court stated that, therefore,

“February 10, 2012 [was a] deadline here that we need to make or

meet.” A review hearing, which would also serve as a pretrial

conference, was scheduled for February 7, 2012 and the TPR

hearing for March 2, 2012.

 13
 The court observed that “I suppose someone could make an argument
that, you know, [Petitioner] was a minor all this time and she didn’t become
an adult until recently, and therefore somehow the time is tolled.” However,
this argument was not pursued by either party.

 18
 ***FOR PUBLICATION IN WEST’S HAWAI#I REPORTS AND PACIFIC REPORTER***

 At the pretrial hearing on February 7, 2012, Petitioner

moved for a six-month continuance of the TPR hearing because

Petitioner had done “a tremendous turnaround”:
 [Jackson]: You know, on behalf of [Petitioner], who just
 turned 18 in September, I would like to say or reiterate a
 couple of things and ask the Court to consider her age and
 to consider the fact that recently, certainly since the last
 hearing, she’s done a tremendous turn-around.

 . . .

 [Petitioner] feels that she’s going to lose contact with
 [T.M.], that he’s going to be in Ocean View, raised by
 people who probably can provide him a good home, but she’s
 afraid of losing him and of losing contact with him. And as
 I say, she’s very, very young. She apparently has gotten
 the message that this child, you know, is her child and that
 if she wants to be his mother and raise him, she has to do a
 number of things to be able to provide a home for him,
 including employment, earning a living, having a home, an
 actual residence where she can live with him and raise him,
 an ability to pay the rent and to provide for him in every
 other way.

 And at this point although we have the hearing scheduled in
 just a few weeks, I’m asking the Court to consider delaying
 that hearing and continuing it for another six months.

(Emphases added.) Petitioner further stated that she wanted to

“continue on her path to be independent and to be able to provide

a home for her son because that is really what she wants to do.”

Hence, Petitioner’s position at the February 7, 2012 hearing

apparently was that she wanted to obtain custody of T.M. in six

months.

 DHS, however, asked the court to “proceed as

scheduled.” DHS said that “apparently mother has done really

well in the past few weeks,” but also felt “it’s important that

. . . pressure continue to be put [sic] in terms of trying to get

 19
 ***FOR PUBLICATION IN WEST’S HAWAI#I REPORTS AND PACIFIC REPORTER***

something done because up to this point . . . [Petitioner’s]

record was really pretty bad in terms of drug use and not doing

services and not visiting.” Similarly, Kim related that

Petitioner had “only been clean for maybe about a month,” and “as

of December, she was still testing dirty[.]” The court denied

Petitioner’s motion for a continuance.

 II.

 A.

 The TPR hearing began on March 2, 2012. At the

hearing, Petitioner took the position that the court should

“delay its ruling on the question of termination . . . for six

months” because Petitioner “has been making progress by leaps and

bounds[.]” Petitioner’s case manager, Susan McCree (McCree),

testified that Petitioner’s drug tests were “negative on

[December 30, 2011, and January 3, 6, 10, 20, and 24, 2011.]”

However, “she tested positive for marijuana on [December 16 and

21, 2011]” McCree was also “informed . . . that [Petitioner]

also tested positive about 30 days ago.”

 McCree related that she would support waiting six more

months if Petitioner’s substance abuse counselor believed that

she would be able to maintain sobriety. After consulting with

Petitioner’s substance abuse counselor, McCree discovered that

Petitioner also had relapsed on alcohol “[t]his past Friday[.]”

McCree expressed concern because “if [Petitioner[] had really hit

 20
 ***FOR PUBLICATION IN WEST’S HAWAI#I REPORTS AND PACIFIC REPORTER***

the point of maturity and honesty that I certainly had thought

she had,” she would have disclosed to DHS that she had relapsed

with alcohol. McCree recommended that the court pursue the

permanent adoption of T.M.

 According to foster mother, Petitioner had lived in her

home along with T.M. from January 7, 2010 until approximately

August 15, 2010. After Petitioner left her home, she visited

T.M. “once a week.” Foster mother testified that her concern

with Petitioner being a full-time mother was her “consistency[.]”

Foster mother explained that she didn’t “think that at this point

[Petitioner’s] anywhere close to being . . . to be a mom 24-7.”

 Foster mother related that although she was willing to

give Petitioner more time in September, she “began to see that

the changes that I had hoped would occur with [Petitioner] as far

as finding a job . . . and being able to take care of herself

were not taking place, were not happening. When she was telling

me that she was clean and sober, she in fact was not clean and

sober. So there were lies going on.”

 On the other hand, Holly Lindstrom (Lindstrom),

Petitioner’s primary care counselor for substance abuse,

testified that she had “seen a change in [Petitioner] over

time[.]” Lindstrom related that Petitioner was “very motivated

to achieve sobriety[.]” She explained that “relapse is just part

of the process of people battling their addiction,” and that

 21
 ***FOR PUBLICATION IN WEST’S HAWAI#I REPORTS AND PACIFIC REPORTER***

Petitioner “admitted to me that she felt like she had turned a

corner based on recognizing that she really is an addict and that

she needs to really embrace recovery.” Lindstrom felt that

Petitioner was now “taking this more seriously,” and was “willing

to try and help herself recover.”

 However, Lindstrom also testified that Petitioner was

“in the early phases of recovery.” Petitioner’s recovery program

consisted of five stages, “pre-contemplative, contemplative,

preparation, action, and maitenance[.]” Petitioner was presently

in the “contemplative” stage.

 Petitioner’s probation officer, Wendy Mitchell

(Mitchell) also testified that Petitioner had made significant

progress recently. Mitchell related that in “the past three,

four months, I see a very big turn-around, like 180-degree

turn-around of her for the most part. That’s mostly consistent,

you know, occasional little slips from that, but way more honest,

way more willing to admit to her slips, her relapses, the

mistakes she’s making, and just being a lot more forthcoming in

acknowledging her weaknesses and her areas of her problems.”

 Mitchell also noted that Petitioner had voluntarily

admitted her recent use of alcohol both to herself and Lindstrom.

Mitchell explained that this made her feel “really positive,

really good,” because Petitioner was “being honest with

[Mitchell], and “this was something she could have gotten away

 22
 ***FOR PUBLICATION IN WEST’S HAWAI#I REPORTS AND PACIFIC REPORTER***

with.” Mitchell believed that Petitioner was “committed to

working towards sobriety at this time[,] and that “her son is her

number-one priority most of the time[.]” Following questions

from the Court, Mitchell stated that Petitioner admitted that she

had received alcohol “from a young man she was cruising with[.]”

 Petitioner testified that she did not feel she could

currently take care of T.M. However, she believed that she would

be able to care for him “within the next four to six months[.]”

Petitioner had recently obtained a job where she would earn

“possibly $588 to $600 a month,” and that she would use this

money to pay her rent on a studio apartment. She was planning to

complete her education at Hawai#i Community College. According

to Petitioner, she had been spending all day at foster mother’s

home with T.M. every Saturday and Sunday for “six to eight weeks

now.” Petitioner explained that she would wake up at between

four o’clock or “five o’clock in the morning” and either

hitchhike or take the bus in order to spend the entire day with

T.M.

 Petitioner further stated that she was “committed” to

her substance abuse recovery program. She felt that she had a

“very good” relationship with Lindstrom.

 In closing argument, Kim, T.M.’s guardian ad litem,

also requested that Petitioner’s parental rights be terminated.

She stated that “it’s indisputable” that “[Petitioner] has really

 23
 ***FOR PUBLICATION IN WEST’S HAWAI#I REPORTS AND PACIFIC REPORTER***

tried to step up to the plate since the last hearing in

December,” but that “[u]nfortunately, she is still quite new in

her recovery.” Kim maintained that “a child does not wait for

his or her parents,” and “[T.M.’s] been growing for over two

years now in the system, and he does deserve a permanent home[.]”

 B.

 The court orally issued its decision terminating

Petitioner’s parental rights on March 16, 2012. On May 3, 2012,

the court issued its written findings and conclusions regarding

the TPR hearing. In relevant part, the court found that

Petitioner “has made positive progress and matured over the last

couple months,” but that “the evidence also indicates that

[Petitioner] lacks adequate resources and ability to care for

both herself and her son.” The court was “not confident that

[Petitioner] will be able to make lasting positive changes at any

point in the near future.”

 The court therefore concluded that Petitioner was “not

presently willing and able to provide [T.M.] with a safe family

home, even with the assistance of a service plan” and that it was

“not reasonably foreseeable that [Petitioner] . . . will become

willing and able to provide [T.M.] with a safe family home, even

with the assistance of a service plan, within a reasonable period

of time to not exceed two years from [T.M.’s] date of entry into

foster case, which was on February 10, 2010.” Hence, the court

 24
 ***FOR PUBLICATION IN WEST’S HAWAI#I REPORTS AND PACIFIC REPORTER***

ruled that “[t]he Permanent Plan filed with the court on December

6, 201[1] is in the best interest of the child.” Under the

permanent plan, Petitioner’s parental rights would be terminated

and T.M. would be adopted by his aunt and uncle.

 III.

 Petitioner appealed to the ICA. The ICA affirmed the

court’s decision to terminate Petitioner’s parental rights. The

ICA majority opinion held that the court did not abuse its

discretion “when it failed to appoint counsel to represent

[Petitioner] earlier in the proceedings.” In re T.M., No. CAAP-

12-000521, 2013 WL 3364109, at *1 (Haw. App. 2013) (SDO). The

majority noted that Petitioner “challenges none of the [court’s]

findings of fact but instead[] argues in a vague and conclusory

manner that she could have avoided termination proceedings if

counsel had been appointed sooner.” Id. However, “an

independent view of the record reveal[ed] no indication that the

lack of earlier-appointed counsel prejudiced [Petitioner’s]

substantial rights.” Id. (citing In re Doe, 99 Hawai#i at 534

n.18, 57 P.3d at 459 n.18).

 In this regard, the ICA majority explained that

Petitioner did not file an application for court-appointed

counsel until September 2011, that the proceedings were not

initially adversarial in nature, and that Petitioner “was

counseled by the [court] itself on what was expected of her if

 25
 ***FOR PUBLICATION IN WEST’S HAWAI#I REPORTS AND PACIFIC REPORTER***

she wanted to retain her child.” Id. at *1-2. The majority

concluded that it “[could not] hold that the court’s omission

‘[led] to [an] erroneous decision[.]’” Id. at *1 (quoting

Lassiter v. Dep’t of Soc. Servs. of Durham Cnty., N.C., 452 U.S.

18, 27 (1981)).14 The ICA majority therefore affirmed the

court’s order.

 Chief Judge Nakamura dissented. He noted that “both

the Family Court and the guardian ad litem recognized that

Mother’s rights and interests as a parent were distinct from and

may conflict with Mother’s rights and interests as a child.

Nevertheless, the Family Court waited until nineteen months after

T.M. was placed in foster custody before appointing counsel for

Mother.” Id. at *4 (Nakamura, C.J., dissenting). He would have

held that “the Family Court did not appoint counsel early enough

before the parental termination hearing to give Mother a fair

opportunity to defend against the DHS’s request to terminate her

parental rights.” Id. (citing In re “A” Children, 119 Hawai#i

28, 57-59, 193 P.3d 1228, 1257-59 (App. 2008)). Hence, Chief

Judge Nakamura would have “vacate[d] the order terminating

 14
 The ICA majority held that the court did not abuse its discretion
in refusing to continue the TPR hearing. According to the majority
“[Petitioner] was given a reasonable amount of time, more than two years,
after T.M. was placed in foster custody, to demonstrate that she was willing
and able to provide T.M. with a safe family home.” In light of our
disposition we do not reach the continuance issue.

 26
 ***FOR PUBLICATION IN WEST’S HAWAI#I REPORTS AND PACIFIC REPORTER***

Mother’s parental rights and remanded the case for further

proceedings.” Id.

 IV.

 In her Application Petitioner asks in pertinent part

whether “counsel for an indigent minor parent[,]” such as

Petitioner, should have been appointed “to defend her parental

rights and advise her while her child remained in foster care for

more than nineteen months[.]”

 V.

 We hold that the court’s failure to appoint counsel for

Petitioner prior to September 13, 2012 constituted an abuse of

discretion under HRS § 587-34 and § 587A-17. Because those

statutes15 stated that the court may appoint an attorney to

represent a legal parent who is indigent, HRS § 587A-17; see also

HRS § 587-34, “discretion resided in the court as to whether to

do so[.]” In re Doe, 108 Hawai#i at 153, 118 P.3d at 63 (holding

that a statute that provided that the court “may” appoint a

guardian ad litem left the court with discretion to make an

appointment). “In reviewing a court’s exercise of discretion it

must be determined whether the court abused its discretion.” In

re Doe, 108 Hawai#I at 153, 118 P.3d at 63. “An abuse of

discretion occurs when the trial court “exceeds the bounds of

 15
 HRS § 587A-17 was not raised by either party.

 27
 ***FOR PUBLICATION IN WEST’S HAWAI#I REPORTS AND PACIFIC REPORTER***

reason or disregards rules of principles of law or practice to

the substantial detriment of a party[.]” Id. (internal quotation

marks omitted).16

 A.

 The record demonstrates that the court was aware from

the inception of the proceedings that Petitioner required an

attorney in her role as mother, yet failed to appoint one until

September 13, 2011. The nineteen month delay in the appointment

of counsel for Petitioner constituted an abuse of discretion.

 As noted, on January 6, 2010, DHS filed a petition to

assert temporary custody over both Petitioner and T.M. A hearing

on the Petition was held on January 7, 2010, and the court

informed all of the parties that they could file an application

for a court-appointed attorney. As to Petitioner, the court

explained that she was entitled to a guardian ad litem as a

child, and to an attorney as a mother. The court stated that it

 16
 In its Response to the Application, DHS maintains that the court
did not err. According to DHS, Petitioner “speculates that [she] would not
have lost her parental rights if an attorney appointed earlier had: explained
the deadlines of the Child Protective Act to [her], developed a strategy to
comply with the service plan, and/or sought out relatives to take custody of
T.M. instead of the child remaining in DHS foster custody.” DHS argues,
however, that once an attorney was appointed for Petitioner, her attorney did
not raise any of these issues. Thus, DHS maintains that “Petitioner and her
attorney determin[ed] that they were satisfactorily addressed or that they
were not significant enough to raise (thus waiving any objections).”
 DHS also asserts that “[a]lthough [Petitioner] was not represented
by legal counsel during a major portion of this case, she did have an attorney
when it mattered most, the five-and-a-half months prior to the TPR hearing.”
According to DHS, “[w]hile it is true that [Petitioner] was not provided with
a court-appointed attorney until after she [became] an adult, it is also true
that [Petitioner] did not submit her application for a court-appointed
attorney until a week before her 18th birthday.”

 28
 ***FOR PUBLICATION IN WEST’S HAWAI#I REPORTS AND PACIFIC REPORTER***

would try to appoint an individual to “act in both

responsibilities,” but acknowledged that there might be a

conflict if the same person was appointed to serve both roles.

 After the initial hearing, the court immediately

granted the applications for a court-appointed attorney for

T.M.’s father and Petitioner’s mother. However, the court did

not appoint an attorney for Petitioner, even though it recognized

the potential conflict of having one person serving both as

guardian ad litem and as attorney. Instead, St. John was

appointed as Petitioner’s guardian ad litem. At the January 14,

2010 hearing the court told St. John that she was “playing a dual

role here.” However, St. John, rejected the assertion that she

was also serving as Petitioner’s attorney. The record does not

indicate that the court followed through with St. John to

determine whether a conflict existed between her “dual

role[s].”17

 Despite the court’s recognition at the January 7, 2010

hearing that it was “a good idea” for the parties to be

represented by counsel, and that unrepresented parties would have

 17
 The failure to appoint counsel was not remedied by the appointment
of St. John as Petitioner’s guardian ad litem. Due to the possibility of a
conflict of interest between a guardian ad litem’s role as the advocate of the
best interests of the child and a lawyer’s role as the zealous advocate of the
client’s position, it has been explained that “it is important that [a]
guardian ad litem . . . not undertake to represent [the child] as a parent.”
Sarah Katz, When the Child is a Parent: Effective Advocacy for Teen Parents in
the Child Welfare System, 79 Temp. L. Rev. 535, 552 (Summer 2006).

 29
 ***FOR PUBLICATION IN WEST’S HAWAI#I REPORTS AND PACIFIC REPORTER***

difficulty understanding the legal significance of the

proceedings, the court failed to appoint Petitioner an attorney.

Thus, Petitioner was the only primary party18 without counsel.19

 At the May 24, 2011 hearing, St. John brought

Petitioner’s absence of counsel to the court’s attention.

St. John stated that she was only serving as Petitioner’s

guardian ad litem, and reminded the court that Petitioner had

never been assigned an attorney. At the same hearing, DHS

informed the court that it was going to file a motion to

terminate Petitioner’s parental rights. St. John then suggested

to the court that because the DHS sought to terminate

Petitioner’s parental rights, counsel should be appointed for

Petitioner. However, the court took no action even though it had

the discretion to appoint counsel for Petitioner. Instead, the

court left it to the guardian ad litem who had taken opposing

positions to that of Petitioner to do so.

 On September 13, 2011, the court noted that it had

received Petitioner’s application for counsel but that it had

“not appointed anyone yet” because of the “possibility that this

matter is going to be resolved by way of [an agreement between

the parties regarding] a guardianship.” Thus, despite the

 18
 As stated before, the court also did not appoint counsel for
T.M.’s father.

 19
 To reiterate, DHS agreed that the court waited nineteen months to
appoint an attorney for Petitioner, while she was a minor.

 30
 ***FOR PUBLICATION IN WEST’S HAWAI#I REPORTS AND PACIFIC REPORTER***

existence of ongoing negotiations among the parties, Petitioner

was left unrepresented. The court’s decision to delay the

appointment of counsel until after the outcome of the settlement

proceedings left Petitioner without a legal advocate for her

position in the crucial negotiations among Petitioner, T.M.’s

guardian, and DHS.

 On September 20, 2011, only five months before the

termination hearing, Jackson appeared for the first time. The

court at several points asked Jackson if Petitioner was willing

to agree to terminate her parental rights, even though

Petitioner’s counsel had “just met with Petitioner [that]

morning.” Jackson disclosed that she “didn’t think that [the

termination of parental rights was] the way the case was going.”

Thus, it is apparent that at the September 20, 2011 hearing DHS

abandoned its original approach of guardianship without parental

rights termination, and the court shifted to asking Petitioner to

accede to the termination of her parental rights. Consequently,

it was crucial that Petitioner was provided counsel at the

inception of the proceedings to inform her of the limitations of

the guardianship approach and of the possibility that if other

options were pursued, her parental rights would be in jeopardy.

 Additionally, nothing in the record demonstrates that

Petitioner was aware that she had a two-year deadline to provide

 31
 ***FOR PUBLICATION IN WEST’S HAWAI#I REPORTS AND PACIFIC REPORTER***

T.M. with a safe family home under the Child Protective Act.20

The report from the first Ohana Conference incompletely stated

that Petitioner had one year to provide a safe family home for

T.M. Thus, Petitioner was without counsel to advise her of

significant deadlines.

 Finally, the events following the appointment of

counsel indicate the necessity of appointing counsel for

Petitioner at the time T.M. was taken into DHS custody. At the

September 13, 2011 hearing, St. John noted that Petitioner

“wasn’t really listening to what the attorneys and the social

workers were telling her in the hearing that she needed to hear.”

Therefore, St. John believed that Petitioner “really [did] need

to sit down with somebody as an attorney for her . . . [to] get

the advice that she needs as a mother dealing with her child.”

(Emphases added.) St. John’s statement makes it clear that,

 20
 Although Petitioner seemingly maintains otherwise, the Family
Service Plan filed on March 3, 2010 did not violate HRS § 587A-27(a)(7) for
not informing Petitioner that “the parents’ failure to provide a safe family
home within two years from the date when the child was first placed under
foster custody by the court, may result in the parents’ parental rights being
terminated[.]” HRS § 587A-27(a)(7) did not take effect until September 1,
2010, after March 3, 2010. See 2010 Haw. Sess. Laws Act 135. Although the
two-year deadline existed under the prior statute, see HRS § 587-73, the
requirement in HRS § 587A-27(a)(7) that the family service plan “shall provide
. . . notice to the parents” of the two-year deadline was not contained in
prior Hawai#i law. See HRS § 587-26. Also, the prior statute required that a
family plan “set forth . . . the time frames during which . . . such actions
must be completed.” HRS § 587-26(c)(2). In violation of HRS § 587-26(c)(2),
the family plan in this case did not contain the requisite specific time
frames.
 The revised service plan dated January 21, 2011 was subject to HRS
§ 587A-27(a)(7). That revised service plan also did not inform Petitioner of
the two-year deadline, in violation of HRS § 587A-27(a)(7).

 32
 ***FOR PUBLICATION IN WEST’S HAWAI#I REPORTS AND PACIFIC REPORTER***

prior to September 13, 2011, Petitioner was not afforded legal

advice on how to maintain her parental rights to T.M.

 However, following the court’s appointment of an

attorney, Petitioner’s behavior improved significantly.

Petitioner began to pass her drug tests and become more involved

in her substance abuse counseling. This was reflected in the

court’s findings after the termination hearing. The court stated

that Petitioner had “made positive progress and matured over the

last couple of months.” Petitioner made rapid strides following

the appointment of counsel.

 Additionally, Petitioner had made progress in being

able to provide a safe family home for T.M. Petitioner had lived

with T.M. for eight months in foster mother’s home, and visited

once a week after August 15, 2010. Before trial, Petitioner

would wake up before 5 a.m. to travel to foster mother’s home to

spend both Saturday and Sunday with T.M. Therefore, Petitioner

had probably developed a connection with T.M. It may be that had

counsel been appointed sooner, Petitioner may have been able to

comply with the terms of the family plan and provided T.M. with a

safe family home at an earlier date.

 B.

 In sum, the court did not appoint counsel for

Petitioner until more than nineteen months after T.M. entered

foster custody, and only five months prior to the hearing that

 33
 ***FOR PUBLICATION IN WEST’S HAWAI#I REPORTS AND PACIFIC REPORTER***

ultimately terminated Petitioner’s parental rights. The failure

to immediately appoint counsel for Petitioner even after it

became apparent that DHS would seek to terminate Petitioner’s

parental rights left Petitioner without the necessary assistance

to prepare for the March 2, 2012 termination hearing. Petitioner

was without legal guidance and did not have an advocate to

represent her in negotiations with DHS.

 Because for most of the proceedings, Petitioner was the

only primary party without counsel, it was unreasonable not to

have afforded Petitioner the assistance of counsel while the

other primary parties, including DHS, were represented by

counsel. Consequently, the court abused its discretion in

failing to appoint counsel earlier in the proceedings. Thus, the

court’s April 17, 2012 Order Terminating Parental Rights and

Awarding Permanent Custody to DHS must be vacated, and the case

remanded for a new hearing.

 VI.

 The foregoing review of the instant case reveals the

inadequacy of an approach that allows the appointment of counsel

to be determined on a case-by-case basis once DHS moves to

assert foster custody over a child.21 In Doe, this court

 21
 On October 11, 2013, Amici Curiae Legal Aid Society of Hawai#i,
Hawai#i Appleseed Center for Law and Economic Justice, and American Civil
Liberties Union of Hawai#i Foundation (Amici) filed a brief in support of
Petitioner. Amici argued that “[t]he case-by-case approach to appointing
counsel imposes an impossible burden on trial judges,” because such an

 34
 ***FOR PUBLICATION IN WEST’S HAWAI#I REPORTS AND PACIFIC REPORTER***

“affirmed, independent of the federal constitution, that parents

have a substantive liberty interest in the care, custody, and

control of their children protected by the due process clause of

article I, section 5 of the Hawai#i Constitution.” 99 Hawai#i at

533, 57 P.3d at 459. Doe explained that “parental rights

guaranteed under the Hawai#i constitution would mean little if

parents were deprived the custody of their children without a

fair hearing.” Id. “Indeed, ‘[p]arents have a fundamental

liberty interest in the care, custody, and management of their

children and the state may not deprive a person of his or her

liberty interest without providing a fair procedure for the

deprivation.’” Id. (quoting Hollingsworth v. Hill, 100 F.3d

733, 738-39 (10th Cir. 1997)). Doe therefore held that the

right to a “fair procedure” required the appointment of

interpreters “at family court proceedings where [] parental

approach “‘compel[s] a trial court to ‘determine in advance what difference
legal representation might make’” and “a case’s complexity might change as the
case develops.” (Quoting Lassiter, 452 U.S. at 51 n.19 (Blackmun, J.,
dissenting).) (Emphasis in original.)
 Additionally, Amici maintained that the failure to appoint counsel
prior to trial can “preclude a meaningful review of a denial of counsel by the
appellate court,” because “‘a parent acting pro se is . . . likely to be
unaware of controlling legal standards and practices, and unskilled in
garnering relevant facts.’” (Quoting Lassiter, 452 U.S. at 51 n.19 (Blackmun,
J., dissenting).) Therefore, a parent acting pro se is unlikely to develop a
record sufficient to allow meaningful appellate review.
 Finally, as to the court’s statement that it was considering St.
John as both Petitioner’s attorney and guardian ad litem, Amici assert that
“such attempt at dual-capacity representation would have been ineffective” due
to obvious conflicts of interest. For example, “‘the guardian ad litem may
have intimate knowledge of the teenager’s mistakes or foibles which could be
used against her in determining whether her child is to be adjudicated
dependent.’” (Quoting Katz, When the Child is a Parent 79 Temp. L. Rev. at
552.)

 35
 ***FOR PUBLICATION IN WEST’S HAWAI#I REPORTS AND PACIFIC REPORTER***

rights are substantially affected.” 99 Hawai#i at 534, 57 P.3d

at 460.

 In In re “A” Children, the ICA held that the court’s

failure to timely appoint counsel resulted in the father not

receiving notice of hearings. 119 Hawai#i at 58, 193 P.3d at

1258. Judge Watanabe, writing for the ICA, pointed out that

this created “a chain of events” that led to the termination of

his parental rights and “that could have been broken if Father

had had counsel.” Id. The ICA applied the case-by-case

approach adopted by a majority of the Supreme Court in Lassiter,

where that court balanced the parent’s interests, the state’s

interests, and the risk that a parent will be erroneously

deprived of his or her child. Id. at 57, 193 P.3d at 1257. The

ICA concluded that the dispositive factor was the third factor,

and ruled that the “belated appointment of an attorney created

an appreciable risk [the father] would be erroneously deprived

of his parental rights[.]” Id. at 58, 193 P.3d at 1258.

 However, the ICA “express[ed] grave concerns . . .

about the case-by-case approach adopted in Lassiter for

determining the right to counsel.” Id. at 60, 193 P.3d at 1260.

According to the ICA, “as Justice Blackmun observed,” under the

case-by-case approach, “[a] trial judge will be required to

determine in advance what difference legal representation might

make.” Id. (quoting Lassiter, 451 U.S. at 51 n.19 (Blackmun,

 36
 ***FOR PUBLICATION IN WEST’S HAWAI#I REPORTS AND PACIFIC REPORTER***

J., dissenting). The ICA then concluded that “the

Lassiter dissents present compelling arguments for a bright-line

rule regarding the provision of counsel in termination-of-

parental rights cases[.]” Id.

 In RGB, an indigent parent asserted that her court-

appointed counsel was ineffective. 123 Hawai#i at 17, 229 P.3d

at 1082. Because the family court-appointed counsel, the RGB

majority “decline[d] to reach the question of whether the

Hawai#i Constitution provides indigent parents a right to

counsel in all termination proceedings.” Id. at 18, 229 P.3d at

1083.22

 B.

 Inherent in the substantive liberty interest that

parents have in the care, custody, and control of their children

under the Hawai#i Constitution is the right to counsel to

prevent erroneous deprivation of their parental interests. As

Justice Stevens asserted in Lassiter, the State’s decision to

deprive a parent of his or her child is often “more grievous”

than the State’s decision to incarcerate a criminal defendant.

 22
 The dissenting opinion explained that counsel was ineffective for
“failing to file a timely motion for reconsideration of the court’s
Termination Order,” and the late appointment by the family court of counsel
left Petitioner’s counsel with only “two days in which to file a timely motion
for reconsideration.” RGB, 123 Hawai#i at 62, 229 P.3d at 1127 (Acoba, J.,
dissenting). The dissent concluded that as “the right to effective assistance
of counsel is protected under the Hawai#i Constitution . . . the majority’s
opinion implicate[d] [the parent’s] due process right to effective counsel
under the Hawai#i Constitution.” Id. at 50, 229 P.3d at 1115 (internal
emphasis removed).

 37
 ***FOR PUBLICATION IN WEST’S HAWAI#I REPORTS AND PACIFIC REPORTER***

Lassiter, 452 U.S. at 59 (Stevens, J., dissenting). Hence, “the

reasons supporting the conclusion that the Due Process Clause .

. . entitles the defendant in a criminal case to representation

by counsel apply with equal force” in cases where the state

seeks to terminate parental rights. Id. (emphasis added).

 This court has held that “[t]he right to counsel is an

essential component of a fair trial” in the criminal context.

State v. Tarumoto, 62 Haw. 298, 299, 614 P.2d 397, 398 (1980).

The same considerations suggest that an attorney is necessary

for a “fair procedure” in parental termination proceedings. See

Doe, 99 Hawai#i at 534, 57 P.3d at 460; see also RGB, 123 Hawai#i

at 47, 229 P.3d at 1112 (Acoba, J., dissenting) (stating that an

attorney should be provided in termination hearings in light of

the “constitutionally protected liberty interest at stake”).

 Furthermore, as Justice Blackmun explained in

Lassiter, a parent in termination proceedings may struggle with

legal issues that are “neither simple nor easily defined,” and

with a standard that is “imprecise and open to the subjective

values of the judge.” 452 U.S. at 45 (Blackmun, J.,

dissenting). A parent must “be prepared to adduce evidence

about his or her personal abilities and lack of fault, as well

as proof of progress and foresight as a parent[.]” Id. at 46.

They are faced “with an adversary -- the State -- that commands

great investigative and prosecutorial resources, with standards

 38
 ***FOR PUBLICATION IN WEST’S HAWAI#I REPORTS AND PACIFIC REPORTER***

that involve ill-defined notions of fault and adequate

parenting, and with the inevitable tendency of a court to apply

subjective values or to defer to the State’s ‘expertise.’” Id.

 In Matter of K.L.J., 813 P.2d 276 (Alaska 1991), the

Alaska Supreme Court held that counsel is necessary in

termination proceedings because “‘the crucial determination

about what will be best for the child can be an exceedingly

difficult one[,] . . . it requires a delicate process of

balancing many complex and competing considerations that are

unique to every case.’” Id. at 282 (quoting Flores v. Flores,

589 P.2d 893, 896 (Alaska 1979)). Thus, “a parent cannot

possibly succeed” without “the guiding hand of counsel.”

Lassiter, 452 U.S. at 46 (Blackmun, J., dissenting). Hence, the

appointment of an attorney is crucial to ensure that parents are

provided a “fair procedure.” See Doe, 99 Hawai#i at 533, 57

P.2d at 458.

 Doe held that an interpreter was necessary where

“parental rights are substantially affected.” 99 Hawai#i at

534, 57 P.2d at 459. In the context of the Child Protective

Act, the filing of a petition to assert custody initiates the

termination process. As stated before, once a child is “is in

foster care under the department’s responsibility” for an

aggregate of fifteen of twenty two months, DHS must file “a

motion to terminate parental rights.” HRS § 587A-33(I). At a

 39
 ***FOR PUBLICATION IN WEST’S HAWAI#I REPORTS AND PACIFIC REPORTER***

termination hearing, parents must establish that they can

provide a safe family home within two years of the child’s entry

into foster care. HRS § 587A-33(a)(2). However, before the

termination hearing itself, issues that may be decisive in that

proceeding may have been determined subsequent to DHS attaining

custody of the child. Thus, as soon as DHS files a petition

asserting custody over a child, parents’ rights are

“substantially affected.” At that point, an attorney is

essential to protect an indigent parent’s liberty interest in

the care, custody and control of his or her children.23

 VII.

 Mandating the appointment of counsel for indigent

parents once DHS moves for custody would remove the vagaries of

a case-by-case approach. As mentioned before, under the case-

by-case approach, “‘it will not always be possible for the trial

court to predict accurately, in advance of the proceedings, what

facts will be disputed, the character of cross-examination, or

 23
 In contrast to the federal rule, see Scott v. Illinois, 440 U.S.
367, 373-74 (1979), indigent criminal defendants in Hawai#i have a right to an
attorney whenever they are threatened by imprisonment, even if imprisonment is
not subsequently imposed. State v. Dowler, 80 Hawai#i 246, 249, 909 P.2d 575,
577 (App. 1995). The ICA pointed out in Dowler that, because the “Hawai#i
Constitution requires that ‘[t]he State shall provide counsel for an indigent
defendant charged with an offense punishable by imprisonment,’” “an indigent
criminal defendant’s right to appointed counsel is determined not by whether
imprisonment is actually imposed.” Id.
 Thus, in Hawai#i, the appointment of counsel is mandated because
attempting to determine in advance of the proceedings whether legal
representation would ultimately be required is an exercise in futility. The
safeguard for parental rights thus rests on the appointment of counsel at the
beginning of proceedings, in the instant case in February, 2010, when T.M. was
taken into custody by DHS.

 40
 ***FOR PUBLICATION IN WEST’S HAWAI#I REPORTS AND PACIFIC REPORTER***

the testimony of various witnesses.’” Matter of K.L.J., 813

P.2d at 282 n.6 (quoting Kevin W. Shaughnessy, Note, Lassiter v.

Department of Social Services: A New Interest Balancing Test for

Indigent Civil Litigants, 32 Cath. U.L. Rev. 261, 282-83 (1982)

(hereinafter Note, A New Interest Balancing Test); accord RGB,

123 Hawai#i at 49, 229 P.3d at 1114 (quoting K.L.J.). Hence, in

a case-by-case approach, there is a “‘possibility that

appointment of counsel will be denied erroneously by the trial

court.’” Matter of K.L.J., 813 P.2d at 282 n.6 (quoting

Shaughnessy, Note, A New Interest Balancing Test, at 282-83).24

 Similarly, “‘the case-by-case approach . . . does not

lend itself practically to judicial review.’” Id. (quoting

Shaughnessy, Note, A New Interest Balancing Test, at 282-83).

“‘[T]he reviewing court must expand its analysis into a

cumbersome and costly, time-consuming investigation of the

 24
 Under Mathews v. Eldridge, 424 U.S. 319 (1976) courts must
consider the parent’s interests, the state’s interests, and “the risk that a
parent will be erroneously deprived of his or her child because the parent is
not represented by counsel.” Lassiter, 452 U.S. at 27-28. However, “weighing
the [Mathews] factors on a case-by-case basis will always come out in favor of
appointing counsel under the Hawai#i Constitution.” RGB, 123 Hawai#i at 47,
229 P.3d at 1112 (Acoba, J., dissenting) (emphasis in original).
 As to the first factor, “‘a parent’s desire for and right to the
custody of his or her children is an important interest that undeniably
warrants deference and, absent a powerful countervailing interest,
protection[.]’” RGB, 123 Hawai#i at 47, 229 P.3d at 1112 (Acoba, J.,
dissenting) (quoting Lassiter, 452 U.S. at 27) (internal punctuation removed).
As to the second factor, the State’s interests weigh “largely in favor of
appointing counsel,” inasmuch as “‘the State has an urgent interest in the
welfare of the child[.]’” Id. (quoting Lassiter, 452 U.S. at 27) (emphasis in
original). Finally, as to the third factor, “the risk of erroneous
deprivation is undeniably present in every case.” Id. Therefore, even if the
Mathews test is applied, counsel should always be appointed under the Hawai#i
Constitution.

 41
 ***FOR PUBLICATION IN WEST’S HAWAI#I REPORTS AND PACIFIC REPORTER***

entire proceeding.’” Id. (quoting Note, A New Interest

Balancing Test, at 282-83). Moreover, the harm suffered by

parents proceeding without counsel may not be readily apparent

from the record, especially because without the aid of counsel,

it is unlikely that a case is “adequately presented.” Lassiter,

452 U.S. at 51 (Blackmun, J., dissenting).

 Additionally, real human costs are sustained by all of

the parties when, as in the instant case, the court’s failure to

appoint counsel results in a remand for further proceedings.

Under such circumstances, the court’s ultimate determination

regarding a child’s placement may be significantly delayed.

Both parents and children face continued uncertainty regarding

parental status and a child’s future. These costs would be

mitigated by a rule cognizant of the reality that counsel is

essential to ensuring that parents are provided a “fair

procedure.” See Doe, 99 Hawai#i at 533, 57 P.3d at 459.

 In sum, difficulties stemming from the case-by-case

approach can result in the erroneous termination of parental

rights.25 Thus, in light of the constitutionally protected

liberty interest at stake in a termination of parental rights

proceeding, we hold that indigent parents are guaranteed the

 25
 At oral argument, all the parties agreed with mandating the
appointment of counsel in the future. Petitioner explained that there was “no
downside” to a rule requiring the appointment of counsel. Similarly, the DHS
concurred that a prospective rule would “serve the interests of justice.”

 42
 ***FOR PUBLICATION IN WEST’S HAWAI#I REPORTS AND PACIFIC REPORTER***

right to court-appointed counsel in termination proceedings26

under the due process clause in article I, section 5 of the

Hawai#i Constitution. We direct that upon the filing date of

this opinion, trial courts must appoint counsel for indigent

parents upon the granting of a petition to DHS for temporary

foster custody of their children.27

 VIII.

 Based on the foregoing, the court’s April 17, 2012

order terminating parental rights, the May 3, 2012 findings and

conclusions “re TPR Hearing”, and the July 26, 2013 judgment of

the ICA filed pursuant to its June 28, 2013 Summary Disposition

Order affirming the court’s order are vacated, and the case is

remanded to the court for a new hearing consistent with this

opinion.

Benjamin E. Lowenthal, /s/ Mark E. Recktenwald
for petitioner
 /s/ Paula A. Nakayama
Nolan Chock,
(with Mary Anne Magnier /s/ Simeon R. Acoba, Jr.
 on the briefs),
for respondent /s/ Sabrina S. McKenna

 /s/ Richard W. Pollack

 26
 Our decision does not render HRS § 587A-17, which allows courts
the discretion to appoint counsel on a case-by-case basis, unconstitutional.
Rather, our decision augments HRS § 587A-17 in recognition of the due process
protection in the Hawai#i Constitution afforded to parents. Doe, 99 Hawai#i at
533, 57 P.3d at 459.

 27
 We do not address the circumstances under which the right to
counsel could be waived.

 43